Gregg v. Fisher, Appellant.

Argued March 29, 1954. Before STERN, C. J., STEARNE, JONES, BELL, MUSMANNO and ARNOLD, JJ.

446

H. A. Robinson, with him Chauncey E. Brockway, Dickie, McCamey, Chilcote, Reif & Robinson, Albert E. Acker and Brockway, Acker & McKay, for appellant.

Martin E. Cusick and John V. Wherry, with them Hiram M. Drake, Wherry & Ketler, E. B. Madden, Wiesen, Cusick & Madden and George F. Mahaney, for appellees.

OPINION BY MR. JUSTICE MUSMANNO, May 24, 1954:

The story of this case is one of indiscreet tilting of the bottle, reckless hands at the wheel, witless night racing over streets and railroad crossings, and vindictive rivalry born of crass jealousy plus primitive thinking. The result was a calamitous smash-up with death and mangling injury.

On the night of April 9, 1951, John D. Fisher and James Bell met at Dad's Grill in Grove City of Mercer County and planned an automobile drinking party. From Dad's Grill they proceeded to the City Grill and there invited Ruth Ann Garner, a girl 13 years of age, to accompany them on their contemplated alcoholic spree. Fisher then telephoned his girl friend, 22-year old Dorothy Gregg, and she joined the group in front of Dad's Grill some time after 11 o'clock. James Bell summoned his wife (Mary A. Bell), and then Ralph

King, a friend of Ruth Ann's, appeared on the scene to complete the party.

With Fisher at the wheel, the merrymakers headed for Mercer, Pennsylvania, drinking whiskey from a bottle as they travelled, Fisher not denying himself a share of the contents. Somewhere east of Mercer (by chance in front of Wilson's beer garden) Fisher ran off the road, but without resulting mishap. This erratic driving was repeated at least twice again on the journey. Some 25 miles out of Grove City, the gay travellers passed through Sharon and continued on to Masury, Ohio, where they entered the Brookfield Inn for an hour's drinking and then proceeded to the Sky Club, also beyond the Pennsylvania border, where further alcohol was ordered and consumed.

At the Sky Club, one of the girls met for the first time a Robert Trepanosky and he was recruited into the dramatis personae of this spirituous drama of the road. At about 2 a.m., Ruth Ann, the 13-year old, apparently more alert than the older heads about her, voiced the apprehension that Fisher's excessive drinking cast doubts on his ability to drive with safety. Trepanosky volunteered to ask his friend, John Allison, also in the night club, to take the girls home in his car, whereupon Allison entered the scenario of the impending and unfolding tragedy. Some time later, Dorothy and Ruth Ann proceeded on foot from the Sky Club across the State line into Pennsylvania, this being done because of the fear that some law might be violated by transporting the minor Ruth Ann across the boundary between Ohio and Pennsylvania. Allison waited for the girls on a street in Sharon.

John Fisher, while the party was still at the Sky Club, manifested considerable resentment over Dorothy Gregg's choice not to ride back with him to Grove

448

City, remonstrating to Allison: "Listen, fellow, you better let these girls go home with us." He then proceeded to argue with Dorothy that she should not travel in Allison's automobile. Unconvinced by his persuasions, Dorothy walked away from him and he made the cryptic remark (to become significant in the light of what followed) that she would be "sorry."

As the Allison car, now carrying as passengers Dorothy Gregg, Ruth Ann Garner and Robert Trepanosky, pulled away from where the girls had boarded it on the West State Street hill in Sharon, Fisher with the remainder of the party determinedly followed in its immediate wake. Fisher trailed the Allison car over various streets and was hard on Allison's rear as it entered Washington Street in Sharon and committed itself to the rumbling advance over the five railroad tracks which cut across that thoroughfare. Overtaking Allison on the railroad crossing, Fisher swung to the right, striking Allison's right rear bumper. He maneuvered to the right side of Allison's speeding automobile, apparently trying to outspeed it. As both cars passed over the last railroad track of the crossing, Fisher shot ahead and at a point estimated to be 21 feet 8 inches from the western end of the crossing, he suddenly cut his wheel to the left into the direct path of Allison and stopped. Allison jammed on his brakes and swung to the left to avoid the barricade of Fisher's car, but the momentum caused him to jump the curb, bound some 30 feet across a yard and crash head-on into a tree, the impact instantly killing Robert Trepanosky, knocking the two girls and Allison unconscious and inflicting serious injuries on both Allison and Dorothy.

Dorothy Gregg and the administrator of the estate of Robert Trepanosky brought separate suits against John D. Fisher and John E. Allison, and the individ-

ual lawsuits were tried together. The jury exonerated Allison and returned substantial verdicts for both plaintiffs against Fisher. Motions for judgment n.o.v. and new trials were refused and this appeal followed.

Considering all the evidence in the light most favorable to the plaintiffs, as we are required to do on an appeal of this kind, we conclude that the evidence not only supported the verdicts but raised them to a level of objective unassailability. Counsel for John Fisher urges judgment n.o.v. on the ground that the incontrovertible physical evidence shows that the accident could not have happened as described by the plaintiffs' witnesses. In arguing this proposition he points out that the Allison car left the road 21 feet 8 inches beyond the crossing, that the Allison car had a minimum length of 14 feet and that Fisher's car was a minimum distance of 6 feet ahead of Allison when it started to turn left. This, he maintains, shows that the Fisher car was at least 20 feet from the crossing when it allegedly turned in front of the Allison car. "At this point," he says further, "Allison was within 1 foot 8 inches of the point where he struck the curb." And then he sums up: "In order to believe the version of the accident of the plaintiff and her witnesses it must then be believed that the Allison vehicle pivoted from its course upon the street in 1 foot 8 inches and went over the curb."

Counsel assumes that the distances referred to are as fixed as Euclid's tables but in the body of his argument he discloses the shifting potentialities of the factors involved in the accident. He speaks of the Allison vehicle being "*14 feet to 16 feet* in length"; of the Fisher car being in advance of the Allison vehicle "*between 6 to 10 feet*"; that Fisher pulled in front of Allison "5 *or* 6 feet from the left curb;" that the Allison car "was *about* in the middle of the road."

Counsel argues further: ". . . if the length of the Allison car is taken at 16 feet *or* the distance that the Fisher car was ahead of the Allison car is taken as 8 feet *or* 10 feet the Allison car *would have* already started over the curb when the Fisher car began to turn left. It is to be remembered that the cars were traveling parallel, with the Fisher car being *2 to 3* feet away from the Allison vehicle up until this point was reached."

A collection of *"ifs"*, *"ors,"* *"takens"*, and *"would haves"* cannot possibly provide the trestles on which to build the bridge of the doctrine of incontestible physical facts. In *Hostetler v. Kniseley,* 322 Pa. 248, 250, the appellant sought to apply this doctrine by relying on the speed of the fatal car involved in the accident and the positions of the colliding cars immediately preceding and following the collision, as established by oral evidence. This Court said in that connection: "We have frequently held that incontrovertible physical facts are never established by oral evidence as to position, speed, etc., of movable objects."

What we said in *Reiser v. Smith,* 332 Pa. 389, 393, could well apply to this case: "We do not find in this record any 'incontrovertible physical facts' which indelibly stamp falsity on the testimony offered in behalf of plaintiff, nor do we find it physically impossible for the accident to have happened in the manner described by the plaintiff and his witnesses."

A reading of the record vividly tells a story that does not depend on the juggling of inches and the wheeling into place of ponderous hypotheses to establish verisimilitude or credibility. The witnesses told a perfectly plausible story of a man whose mental outlook was so distorted by the fumes of alcohol and the heat of jealousy that, reckless of consequences, heed-

less of peril, utterly destitute of moral and legal accountability, he propelled his car across the path of the one containing his assumed jilting girl friend, crazily intending to inflict upon her such distress as would cause her to be "sorry" for what she had done.

It would be difficult to find in the law books a case where a motorist could be more responsible for a wholly unnecessary and most serious accident than the one which the facts in this litigation portray. With the dawning of reason and the cold realization of what his great folly had accomplished, Fisher took refuge in the palpably incredible explanation that he "blacked out" before the accident (although he continued to drive miles all the way home to Grove City) and therefore had no memory of the accident. He admitted driving from the spot where the Allison car had been parked to the bottom of the hill where he stopped for a red light, and from that point on he was unconscious, although still at the wheel! Some of his amazing testimony follows: "Q. Do you remember driving down over the hill? A. Yes. Q. How far down over the hill, do you remember? A. To the stop light and stopped. Q. What happened after that? A. I don't know. Q. But you drove the car from then on? A. I did. I was supposed to drive it. Q. You drove that car, the car you were in didn't you? A. Yes. Q. What kind of a car was it? A. 1940 Plymouth. Q. And you were driving it and didn't know it, had no recollection of driving it? A. No. Q. What happened to you? A. I can't remember. Q. You can't remember a thing? A. No."

Whatever may have been the type of mental disturbance or amnesia that Fisher wanted the jury to believe had struck him as he drove his car, he was candid enough to admit the cause of the strange phenomenon: "Q. You drove that car didn't you? A. I don't know whether I did or not. I don't remember

being off State Street. Q. You have been informed you were the driver of the car all that time—is that correct? A. Yes. Q. Do you believe you drove that car? Do you think you did? A. Yes, I do. Q. *And your reason, then for that blackout is that you had too much to drink?* A. *Yes.*" (Emphasis supplied.)

One of the passengers in the Fisher car testified that immediately after the accident Fisher said: "There's something going to come of this." Fisher did not deny that he made this remark, nor did he attempt to explain what kind of mental aberration it was which caused him to evaluate the seriousness of his offence although "blacked out" at the time he committed it.

In cross-examining Fisher on his alleged loss of memory, counsel for Allison asked him if he had heard certain testimony at the criminal trial arising out of this same occurrence. Fisher had not taken the witness stand at the criminal trial. Allison's counsel referred to this fact in cross-examining Fisher and then asked: "And as a result in that case you were convicted?" Fisher's counsel objected and the Court sustained the objection, at the same time instructing the jury to disregard the question. Counsel for Fisher then asked for the withdrawal of a juror and this motion was likewise refused.

Although the question put by Allison's counsel was an unfortunate one, it is not evident, in the light of all the circumstances at the trial, that the Court abused its discretion in refusing to declare a mistrial. The Trial Court twice instructed the jury to disregard any reference to any other proceeding.

In *Cook v. Erie Electric Motor Co.*, 225 Pa. 91, this Court said: "It has been frequently held that in this class of cases no irregularities should be permitted which tend to inflame the prejudices of the jury

against the defendant, and in a flagrant case this court will reverse for such error. But so much depends on the immediate circumstances and what may be called the atmosphere of the trial that a large discretion must be allowed to the trial judge."

In *Stephens v. Sulkin*, 280 Pa. 211, this principle was affirmed: ". . . the question of the withdrawal of a juror depends largely upon the atmosphere of the trial and is a matter for the discretion of the presiding judge."

Fisher's counsel urges that the lower court erred in allowing testimony on events and occurrences which preceded by several hours and a number of miles the actual accident, specifically referring to the fact of Fisher's driving off the road on the outward journey to the Sky Club and the discussions at the Club about the return of the girls in Allison's car. To restrict the compass of a trial (criminal or civil) to the pinpoint of the culminating crisis would be to make the verdicts of juries mere guesses. Ten witnesses may have been on the scene at the very moment that A shot B, but unless evidence is allowed as to the events which preceded the shooting it would be impossible to determine whether there was involved in the shooting affray such vital items as self-defense, lying in wait, premeditation, intended robbery, revenge, etc., etc. Examining only the tip of a pyramid can offer no intelligence as to the height, width, breadth or the materials which hold it together and raises the crest toward the sky. It is just as important to know what precedes a storm as what follows it in order to ascertain scientifically its meteorological cause.

The tragedy at the west end of the Washington Street crossing was but the apex of the pyramid of occurrences which had its base at the Dad's Grill in

Grove City when Fisher initiated the ill-starred drinking excursion. The quantity of alcohol consumed, the reckless driving on the outward journey, the wrathful arguments at the Sky Club Inn, the vengeful pursuit in the effort to retrieve Fisher's girl companion were all elements of the gathering storm which broke at the railroad crossing and sent the lightning blast of death and crippling injuries to Robert Trepanosky and Dorothy Gregg under the ill-omened tree off Washington Street. The learned court below well expressed the principle of law involved in a situation of this kind when it said: "The law furnishes no test of relevancy, but tacitly refers it to logic and general experience. Evidence is admissible which tends to make the fact at issue more or less probable or intelligible or to show the origin and history of the transaction between the parties and explain its character."

Any evidence is relevant and proper provided it fits logically into the pattern of asserted negligence leading to the culminating event which is the subject of the lawsuit. We find no error in the holding of the court below on this point.

Fisher's counsel complains that the trial court erred in its reference to the testimony of a witness, Donald Riddle who, from a window in his home after hearing a crash, saw the light on the Allison car beside the fatal tree and an automobile, presumed to be the Fisher car, moving forward on Washington Street. One of the factual disputes at the trial, subsidiary to the main issue of the cause of the collision with the tree, was whether the Fisher car stopped or did not stop after the Allison car left Washington Street and jumped the curb. Riddle did not have a continuous view of the assumed Fisher car as it proceeded on Washington Street into Irvine Avenue because an intervening house shut off his visual pursuit of the

moving vehicle for some 165 feet. Riddle's testimony was not so positive and free of equivocation that the defendant Fisher can use it as a firm and solid foundation for argument that Riddle absolutely disproves the testimony of Allison that the Fisher car stopped just before his (Allison's) forced diversion from Washington Street. For instance, Riddle was asked as to whether the assumed Fisher car stopped at the scene of the accident: "Q. Now, did you see that car continue to move or did it stop? A. I saw the car next turning onto Irvine Avenue. Q. Did it stop? A. I couldn't say." Later on he was certain the car did not stop: "Q. From the time you first saw this car until the last time you saw it, you didn't see it stop any place? A. No. I didn't see it stop any place." Still later, he was in doubt again as to whether the car stopped or not: "Q. It didn't stop at that stop sign? A. Not that I saw."

It isn't even certain that the car, the actions of which Riddle described, *was* the Fisher car. Counsel himself in his brief says: "*If* the moving vehicle which Riddle saw was the Fisher car, Fisher was not responsible for the accident for Riddle had already heard the crash and saw the light of the Allison car from behind the tree where the accident occurred." (Emphasis supplied.)

In evaluating Riddle's testimony, this "If" becomes as large as the house which obtruded between Riddle and the car, the course of which he was attempting to follow, and, therefore, stands as a barrier against accepting his testimony as mathematically accurate. The court, therefore, committed no error in indicating to the jury the possibility of doubt arising from Riddle's testimony. In any event the court instructed the jury that it was their recollection (the

jury's) which was controlling in determining the true facts.

It also is urged in behalf of a new trial that the Trial Judge intimated in his charge that statements made by Allison and Gregg at the hospital immediately after the accident had less bearing than those made at the trial. The accident occurred at 3:17 a.m., the police officer spoke to Miss Gregg at 3:45 a.m. The injuries Miss Gregg sustained were of such a grave character that even at the time of trial (two years subsequent to the accident) she could not walk and possibly she will be crippled for life. When the car hit the tree she was rendered unconscious, she sustained bleeding cuts to her face, the right femur bone was broken, and a part of it protruded through the skin. She had lain in the debris of the demolished automobile for some time before an ambulance arrived and she had not even been taken into the emergency room of the hospital when the police officer asked her what had happened. She replied that she did not know. In view of the fact that she later testified in detail to the events which preceded the accident, Fisher complains that this probably manifests some deliberate fabrication of testimony on the part of Dorothy Gregg. In point of human experience, it would have been more unnatural for Dorothy to have remembered what occurred when she was questioned by the policeman than that she should not remember. It is common knowledge that even a healthy person suddenly shaken from a sound slumber in the middle of the night cannot instantaneously throw his faculties into the high gear of orientation and recollection. How much more difficult it would be then for a young lady having just passed through the horror of witnessing death with open eyes, herself having been knocked unconscious, now bathed in blood and fright-

ful reflections on the possibility of life-long crippling injuries, to narrate coherently what had transpired in the nightmare of her appalling experience?

Neither common knowledge nor medical science finds it inconsistent that, with the rising of the curtain of fright, the administering of the healing hand of time, and the passing of excruciating pain that one's memory as to what happened should be clearer several days after the accident than while the clouds of horror still linger over the anguished victim.

Allison suffered a concussion of the brain and a broken knee as the result of the accident. When questioned by the officer less than 15 minutes after the collision Allison stated that the Fisher car did not stop at the scene of the accident. But in cross-examination he admitted that Allison was dazed at the time: "Q. At the time you interviewed the defendant Allison you knew that he was in a dazed condition? A. Yes, I had that in my office . . . Q. Was Allison in a sort of dazed condition at the time you saw him? A. He was kind of broken up, I wouldn't call it dazed. Q. Suffering from shock? A. Apparently."

Under these circumstances the Trial Judge not only committed no error, but was in law and justice required to charge as he did: "You will have in mind that these parties were in at least two taverns and that some of them were drinking. It was three o'clock in the morning when the accident happened. You will consider whether or not any drinking they may have done affected their recollection. You will consider also that at least two of these parties were injured and determine whether or not their condition when they were interviewed by the policemen explains the statements that were inconsistent with what they said in court." In his appeal to this Court the appellant states: "6. The court erred in refusing to grant a new

458

trial where the jury returned a verdict in favor of one of two joint tortfeasors where the evidence revealed that the exonerated tortfeasor must have been guilty of negligence."

Although this point apparently was not raised in the court below, we have examined it and find that it is without merit.

Judgments affirmed.