Elisabeth M. BYRNE, Administratrix of the Estate of Alice Mora, Deceased,

v.

Michael A. MATCZAK and Ernest Stancick, individually and trading as Tylersport Garage.

No. 20130.

United States District Court
E. D. Pennsylvania.

Sept. 23, 1957.

B. Nathaniel Richter (of Richter, Lord & Levy), Philadelphia, Pa., for plaintiff.

Francis E. Marshall and Max E. Cohen, Philadelphia, Pa., for defendants.

VAN DUSEN, District Judge.

This case is before the court on defendants' alternative post-trial motions (1) to set aside the verdict and enter judgment in their favor, or (2) for new trial, which were filed after entry of judgment on the jury's verdict for plaintiff. Plaintiff's decedent (an eighteen-year old woman, who left surviving an infant child and husband) was killed as the result of a "head-on" collision between the car she was driving and defendants' truck loaded with sand weighing fifteen tons. The principal factual issue before the jury on the subject of liability was which vehicles were not being operated on the right side of the road at the point of collision.

### I. Motion for Entry of Judgment in Defendants' Favor

Even assuming the validity of defendants' contention that the tire marks of their truck, shown at X2, X3 and 4X on Exhibit P-1A, make it impossible for that truck to have made the tire mark at X on that photograph,[1] there is other evidence in the record to support the jury's finding that the collision resulted from the presence of a part of defendants' truck on the south side of the highway at the point of collision. Mr. Fleming, a disinterested witness, testified that he saw the truck coming down the hill before the collision occurred, about 1,000 feet from the point of impact, traveling at a speed of over 50 miles per hour (N.T. 129–131), weaving "back and forth" across the center line of the road (N.T. 119),[2] and that "the collision occurred about in the center of the road" with such violence that he could see a lot of dust and debris flying in the air (N.T. 120, 121). Defendants' evidence shows that the decedent was going at a speed of 30 to 35 miles per hour (N.T. 143), whereas their heavily-loaded truck was admittedly going at a speed of 40 to 45 miles per hour

---

1. The trial judge is not convinced that the scale of the distances on the photographs establishes this contention as an uncontrovertible, physical fact, even though he does not believe the preponderance of the evidence supports the opinion of Police Chief Freas that the marks at X were made by the rear dual wheels of the defendants' truck. See, also, Gregg v. Fisher, 1954, 377 Pa. 445, 450, 451, 105 A.2d 105.

2. The Pennsylvania Supreme Court has held that events leading up to an accident are admissible if they fit "logically into the pattern of asserted negligence leading to the culminating event which is the subject of the lawsuit." See Gregg v. Fisher, supra, 377 Pa. at page 454, 105 A.2d at page 110. Cf. Julian v. Tornabene, 1952, 171 Pa.Super. 333, 337, 90 A.2d 346.

(N.T. 138) and traveled 185 feet from the point of impact in spite of the prompt application of its brakes. Such evidence would tend to corroborate the testimony of weaving. In the light of this evidence, plaintiff was entitled to have the issue of liability submitted to the jury. See Straight v. B. F. Goodrich Co., 1946, 354 Pa. 391, 396, 47 A.2d 605.

## II. *Motion for New Trial*

A. Permitting the jury to go home for the night during their deliberations

██ The jury left the court room in the custody of a Deputy Marshal[3] to begin its deliberations at 3:56 P.M. on June 5, 1957 (N.T. 332), and, with a recess for dinner at a hotel across the street from the Court House, continued its deliberations until 10:35 P.M., when the jurors were brought back to the court room by direction of the trial judge. After a negative answer to the question "Have you agreed upon a verdict?" (N.T. 336), the trial judge sent the jurors home with directions to return to the court room the following morning at 10 A.M. to resume their deliberations, having cautioned them not to speak to anyone or to let anyone speak to them about the case and telling the jurors that each one would be asked the next morning if he or she had obeyed those instructions (N.T. 337–341). Prior to the separation of the jurors, counsel for defendants objected to this separation and the reconvening of the jurors to resume deliberations (N.T. 335, 342–4). At 10 A.M. on the morning of June 6, each juror answered this question in the negative (N.T. 347–8):

"Have you discussed this case directly or indirectly with anyone since you left the courtroom at approximately a quarter to 11:00 last night, and has anyone discussed the case with you?"

A Deputy Marshal was sworn and took the jury out to resume deliberations. After deliberating until 3:45 P.M., with a recess for lunch, the jury returned to the court room to ask a question indicating that they were discussing the damages (N.T. 367, 369–370).[4] The jury requested at 4:55 P.M. to be brought back to the court room to give their verdict (N.T. 372). Counsel for defendants contends that this procedure followed by the trial judge is grounds for a new trial, particularly in view of what they consider to be (a) the weak liability evidence in this case, (b) the unreliability of the testimony of Chief of Police Freas, and (c) the relatively long time the jury was permitted to deliberate before reaching a verdict.

The federal courts have frequently stated that the separation of the jurors during their deliberations does not in itself "affect the substantial rights of the parties," as those words are used in Fed.Rules Civ.Proc. rule 61, 28 U.S.C. See Liverpool, & London & Globe Ins. Co. v. N. & M. Friedman Co., 6 Cir., 1904, 133 F. 713, 716–717; Guardian Fire Ins. Co. v. Central Glass Co., 5 Cir., 1912, 194 F. 851; and cases cited in those cases.[5] The Pennsylvania Supreme Court has said, in Mix v. North

---

3. The usual oath was administered to the Deputy Marshal prior to his escorting the jurors from the court room (N. T. 332). Defendants' contention that the separation of the jurors by order of the trial judge, orally delivered to them in the court room, is in conflict with the oath administered to the Deputy Marshal is not valid, since this Marshal was discharged from his oath by the action of the trial judge (N. T. 341).

4. The jurors had been brought to the court room at 11:12 A. M. on June 6, so that the trial judge could answer a question on the issue of liability which had been sent him by the foreman, as is discussed more fully under C below (154 F. Supp. 885, 886).

5. Cf. Lucas v. United States, 8 Cir., 1921, 275 F. 405, 407 and Bratcher v. United States, 4 Cir., 1945, 149 F.2d 742, 746, applying the same rule in criminal cases.

884

American Co., 1904, 209 Pa. 636, 645, 59 A. 272, 274:[6]

> "While it is true that the separation of the jury in a civil case, after the cause has been committed to them and before they have agreed upon a verdict, is not, as a mere matter of law, ground for a new trial, * * *."

There has been no showing of prejudice resulting from the separation of the jury in this case, such as improper conduct of, or tampering with, a juror during the period of separation. The trial judge does not consider that the separation of the jurors under the facts of this case is a proper ground for a new trial.[7]

B. Items and language of special verdict and comments in charge on these items (pages 28–33 of defendants' brief)

■ Defendants' objections to the form and language of the special verdict and to the trial judge's charge explaining it cannot be considered at this time, since no such objections were made to the special verdict when it was submitted to counsel for comment before the closing speeches (N.T. 199–201) and no such objections were made at the conclusion of the charge when counsel were given an opportunity to state their comments "out of the hearing of the jury." (N.T. 324.) See McDonald v. Pennsylvania R. Co., 3 Cir., 1954, 210 F.2d 524, 531; Callwood v. Callwood, 3 Cir., 1956, 233 F.2d 784, 788; Fed. Rules Civ.Proc. rule 51; cf. Smith v. Ellerman Lines, Ltd., 3 Cir., 1957, 247 F.2d 761.[8]

■ Defendants contend that a surviving husband's compensation under the Wrongful Death Act, 12 P.S.Pa. § 1601 et seq., does not include any compensation for the loss of her companionship, relying on language in Pennsylvania Railroad Co. v. Goodman, 1869, 62 Pa. 329, 339. This language apparently only indicates that the husband's recovery does not include "compensation by way of solace," namely, a value for grief.[9] In an action covered by the Pennsylvania

6. See, also, Carter v. Booth, C.P.Lanc. 1942, 44 Pa.Dist. & Co.R. 284; but cf. Depui v. Prutzman, C.P.Schuylkill 1920, 16 Schuyl.Leg.Record, Pa., 265.

7. The different facts before the court in Snyder v. Lehigh Valley R. R. Co., 3 Cir., 1957, 245 F.2d 112, relied on by defendants, make it inapplicable to the record in this case.

8. Defendants' contention that recovery under the Wrongful Death Act by the surviving husband was barred (see Burns v. Goldberg, 3 Cir., 1954, 210 F.2d 646, 649; cf. Schetter v. United States, D.C. W.D.Pa.1956, 136 F.Supp. 931, 934) because he permitted her to drive his car, knowing she had no driver's license (Lloyd v. Noakes, 1929, 96 Pa.Super. 164; Chamberlain v. Riddle, 1944, 155 Pa.Super. 507, 38 A.2d 521), made it necessary to separate the items (5 & 6) recoverable by the minor child, whose recovery would not have been barred even if the jury had answered question IV "yes," thereby finding negligence on the part of the father, from the items (1 to 4, incl.) recoverable by the father (see N. T. 200). Also, the trial judge disagrees with defendants' contention that items 2, 3, 8 & 9 make the total verdict

inconsistent with Murray v. Philadelphia Transportation Co., 1948, 359 Pa. 69, 73–74, 58 A.2d 323, and Pantazis v. Fidelity & Deposit Co., 1952, 369 Pa. 221, 85 A.2d 421. Under the wording of items 2 and 3 and the charge the jurors were instructed to compute the cost of the decedent's future maintenance, as well as the future gifts she would have received from her husband, and subtract this sum from the amount awarded under these items. If no amount had been awarded under these items, defendants' argument would be well taken, as they might not have received credit for the decedent's future expenditures as found by the jury. If maintenance was not defined broadly enough in the charge (see Bernstein, "Damages in Personal Injury and Death Cases in Pennsylvania (A Supplement)," 26 Pa.Bar Ass'n Quarterly 26, 33 (Oct. 1954)), this should have been pointed out to the trial judge at the time. See, also, Bernstein, "Damages in Personal Injury and Death Cases in Pennsylvania," 23 Pa.Bar Ass'n Quarterly 9, 24 (Oct.1951).

9. The Pennsylvania Supreme Court has stated that the plaintiff in a wrongful death action is entitled to recover the

Wrongful Death Act, recovery for a surviving husband includes the value of the earnings, services and "society" of his deceased wife. See Siidekum v. Animal Rescue League, 1946, 353 Pa. 408, 418, 45 A.2d 59. The Pennsylvania appellate courts appear to use the term "society" as synonymous with "consortium." See Hewitt v. Pennsylvania R. Co., 1910, 228 Pa. 397, 398, 77 A. 623; McMeekin v. Pittsburgh Railways Co., 1911, 229 Pa. 572, 575, 79 A. 133; Reagan v. Harlan, 1903, 24 Pa.Super. 27, 29, 31.[10] In discussing item 4 of Question III–A, of the Special Verdict,[11] the charge did not define "loss of consortium" and "loss of society" separately and direct the jury to add a value for each of these terms, but confined its definition to loss of consortium as comprising "affection, companionship, love, friendship, and the many acts, deeds and assistance which a wife renders to a husband to secure

the success and happiness of a normal married relationship" (N.T. 311).[12]

## C. After-Discovered Evidence

■ Defendants have filed a Supplemental Motion for New Trial,[13] with affidavits annexed, designed to show that newly discovered evidence, which could not have been discovered sooner in the exercise of due diligence,[14] requires a new trial in the interests of substantial justice. The newly discovered evidence consisted of the testimony of G. W. Freas, Chief of Police of Horsham Township, where the accident took place, given on April 2, 1956, at the trial of defendants' truck driver on a manslaughter charge.[15] Mr. Freas was one of the most important witnesses for plaintiff in this case and, on the morning of the second day of the jury's deliberations, the jury asked for the transcript of his testimony and for part of his cross-examination.[16]

value of non-pecuniary benefits which the decedent would have bestowed on his or her family. See Mars v. Meadville Telephone Co., 1942, 344 Pa. 29, 34, 23 A.2d 856, and cases there cited.

10. Cf. Burchfield v. Price, C.P.Schuylkill 1937, 5 Schuyl.Leg.Reg., Pa., 146, 147.

11. Item 4 read "Loss of Consortium and Society."

12. The definition of loss of "services," as this word was used in items 2 and 3 of Question III–A of the Special Verdict, made clear that the value of a wife's services to a husband was normally higher than that of a housekeeper because of the many personal reasons the wife had for rendering services of a better quality and quantity (N. T. 308). This language did not include any value for loss of society.

13. For the reasons stated below, it is not necessary to decide whether this motion properly falls within the scope of paragraphs 2 and 3 of the timely motion for new trial, filed June 12, 1957. According to the trial judge's memory, on the day the verdict was entered, defendants' counsel stated orally in court that they would file a motion for new trial based on after-discovered evidence.

14. Also, there is no need to decide whether defendants' counsel exercised due diligence in view of their failure to have the

testimony of Mr. Freas at the criminal trial transcribed prior to this civil trial for the reason given in the first sentence of the preceding footnote. See pages 3–5 of plaintiff's able brief filed on this point; but see Ferrell v. Trailmobile, Inc., 5 Cir., 1955, 223 F.2d 697, 698, where the court said:

"In such a case, the ends of justice may require granting a new trial even though proper diligence was not used to secure such evidence for use at the trial."

15. Although apparently plaintiff argues that newly discovered evidence impeaching the credibility of a witness is not a proper ground for a new trial (cf. United States v. Rutkin, 3 Cir., 1953, 208 F.2d 647, and cases there cited), in situations such as this one, where such impeaching evidence is directly relevant to the liability issue, circumstances can be imagined where such evidence might be a proper ground for a new trial. Cf. Ferrell v. Trailmobile, Inc., supra; Baruch v. Beech Aircraft Corp., 10 Cir., 1949, 172 F.2d 445.

16. The question asked by the jury was (N. T. 355):

"Would it be possible to get the testimony of Chief Freas? Also cross-examination of the Chief with respect to the markings of tire marks on Photograph P–1."

However, after a careful examination of the transcript of Mr. Freas' testimony at the criminal trial, the trial judge does not believe it is sufficiently material or inconsistent with his testimony in this case to justify the grant of a new trial under all the circumstances. Although he testified at the criminal trial (N.T. 32–4 attached to Supplemental Motion) that traffic, which was caught between the time of the accident and the time he could get a man in position to detour passing vehicles, was allowed to go through the debris resulting from the collision prior to the taking of the photographs offered in evidence, he was not asked this directly at this trial, where his testimony was that no dual-wheel vehicle, such as defendants' truck, went through the sand spilled from the truck and the debris prior to the taking of the pictures (N.T. 54–7).[17] Also, in summarizing Mr. Freas' testimony to the jury in answer to their question, asked subsequent to the charge, the trial judge pointed out that his testimony was that he knew of no other "truck that had gone through this area," prior to the taking of the pictures (N.T. 356) and that on cross-examination "he admitted that there were tire marks * * * through the debris which he said were not" those of the defendants' truck.[18] Although he testified at the criminal trial that his action in letting this traffic through the area of debris and the sand "caused disadvantage in the pictures," he was not asked this question at the civil trial and his admission that some vehicles (other than dual-wheel trucks) went through the area made this deficiency in the

photographs the logical conclusion from his civil trial testimony.[19]

### Order

And Now, September 23, 1957, it is ordered that defendants' motion to set aside verdict and enter judgment for defendants, or in the alternative for a new trial (Document No. 17 in Clerk's file) and defendants' motion for new trial on ground of newly-discovered evidence (Document No. 20 in Clerk's file) are denied.

---

17. Although Mr. Freas initially testified that no vehicle went through the debris prior to the taking of photographs (N. T. 30–1), his later testimony modified this testimony to the statement that no dual-wheel vehicle had done this.

18. The trial judge also pointed out to the jury that Mr. Freas did not get to the scene until 10 minutes after the accident (N. T. 358) and that the pictures showed that a lot of cars had gone through the sand (N. T. 357).

19. Defendants emphasize that he testified at the criminal trial that he saw no tire marks at the scene of the accident, but he was not asked this at the civil trial. At the trial of this case, he testified that a mark appearing on a picture (P–1 and P–1A) as on the south side of the highway was, in his opinion, made by defendants' rear truck wheels because no other dual-wheel vehicle went through the area.