J-A20019-20

NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37

| MATTHEW ONYSHKO AND JESSICA ONYSHKO, HIS WIFE | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|---|
| Appellants | : | |
| v. | : | |
| | : | No. 1611 WDA 2019 |
| NATIONAL COLLEGIATE ATHLETIC ASSOCIATION | : | |

Appeal from the Judgment Entered October 21, 2019
In the Court of Common Pleas of Washington County Civil Division at
No(s):  2014-3620

BEFORE:  BOWES, J., OLSON, J., and MUSMANNO, J.

MEMORANDUM BY OLSON, J.:                         FILED JANUARY 08, 2021

Appellants, Matthew Onyshko and Jessica Onyshko, appeal from the judgment entered on October 21, 2019, in favor of the defendant, the National Collegiate Athletic Association ("the NCAA").  We affirm.

On June 27, 2014, Appellants filed a complaint against the NCAA.  The complaint, which sounded in negligence, alleged and averred the following.

"Plaintiff Matthew Onyshko was a student at California University of Pennsylvania and played college football from 1999-2003.  During his [five-year] collegiate football career, he experienced numerous repeated blows to the head.  On three specific occasions, he lost consciousness for at least [30] seconds."  Appellants' Complaint, 6/27/14, at ¶ 13.  "After graduation, Mr. Onyshko progressively experienced frequent severe headaches, numbness, twitching, muscle atrophy, fatigue, loss of mobility,

slurred speech, difficulty swallowing, weakness and other neurological symptoms." Id. "Mr. Onyshko was recently diagnosed with a progressive brain and spinal cord injury with ALS-like symptoms caused by repeated head trauma during his college football career in the NCAA." Id.

"The NCAA has known or should have known for many years . . . that football players who sustain repetitive head impacts while playing the game have suffered and continue to suffer brain injuries that result in any one or more of the following conditions: early-onset Alzheimer's Disease, ALS [], dementia, depression, deficits in cognitive functioning, reduced processing speed, attention, and reasoning, loss of memory, sleeplessness, mood swings, personality changes, and the debilitating and latent disease known as Chronic Traumatic Encephalopathy ('CTE')." Id. at ¶ 36. "Despite this knowledge, the NCAA failed to act reasonably by developing appropriate means to identify at-risk players and guidelines or rules regarding return to play criteria. The NCAA's inaction prior to 2003 increased the risk of long-term injury and illness in student-athletes, including" Mr. Onyshko. Id. at ¶ 40. Further, the NCAA has repeatedly recognized that it has "a duty to care and protect the well-being of" student-athletes such as Mr. Onyshko – and Mr. Onyshko "relied on the NCAA to disclose relevant risk information and protect his health and safety." Id. at ¶¶ 26 and 38.

Appellants' first count alleged that the NCAA breached its duty of care to Mr. Onyshko by doing such things as: "failing to educate [Mr. Onyshko] concerning symptoms that may indicate a concussion has occurred;" "failing

to warn [Mr. Onyshko] of the risk of unreasonable harm resulting from repeated concussions;" "failing to disclose to [Mr. Onyshko] the special risks of long-term complications from repeated concussions and return to play;" "failing to disclose to [Mr. Onyshko] the role of repeated concussions in causing chronic life-long cognitive and neurological decline;" "failing to promulgate rules and regulations to adequately address the dangers ot [Mr. Onyshko] of repeated concussions and failing to implement a return-to-play policy to minimize long-term chronic cognitive and neurological problems for which [he] was at an increased risk;" "misrepresenting pertinent facts that [Mr. Onyshko] needed to be aware of to make determinations of the safety of return to play;" "concealing pertinent facts necessary for [Mr.Onyshko] to make an informed decision about participating in football;" "failing to adopt rules and reasonably enforce those rules to minimize the risk of [Mr. Onyshko] suffering debilitating concussions;" and, "increasing the risk of harm to [Mr. Onyshko]." Id. at ¶ 63 (some capitalization omitted). Appellants' second count claimed that Plaintiff Jessica Onyshko suffered loss of consortium due to the NCAA's negligent conduct. Id. at ¶¶ 68-69.

The case proceeded to a jury trial on May 3, 2019. On May 23, 2019, the jury returned its verdict in favor of the NCAA. Specifically, the jury concluded that the NCAA was not negligent. N.T. Trial, 5/23/19, at 2851. The trial court denied Appellants' post-trial motion on October 1, 2019 and, on October 21, 2019, judgment was entered on the verdict. Appellants filed a timely notice of appeal and now raise four claims to this Court:

1. Whether the trial court erred by not complying with Washington County Local Rule 221 in relation to the parties' exercise of peremptory challenges?

2. Whether the trial court erred in precluding expert opinion evidence in relation to CTE-ALS and/or CTME, their etiology, and state-of-the-art knowledge concerning these conditions?

3. Whether the trial court erred in admitting the testimony of Dr. William Biddington when his testimony was not based on personal knowledge?

4. Whether the trial court erred in admitting evidence relating to the actions of California University of Pennsylvania?

Appellants' Brief at 4 (some capitalization omitted).

We have reviewed the briefs of the parties, the relevant law, the certified record, the notes of testimony, and the opinion of the able trial court judge, the Honorable Michael J. Lucas. We conclude that Appellants are not entitled to relief in this case, for the reasons expressed in Judge Lucas' October 1, 2019 opinion. Therefore, we affirm on the basis of Judge Lucas' thorough opinion and adopt it as our own. In any future filing with this or any other court addressing this ruling, the filing party shall attach a copy of Judge Lucas' October 1, 2019 opinion.

Judgment affirmed. Jurisdiction relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: <u>1/08/2021</u>

Filed 11/21/2019 4:28:00 PM Superior Court Western District
1611 WDA 2019

IN THE COURT OF COMMON PLEAS OF
WASHINGTON COUNTY, PENNSYLVANIA
CIVIL DIVISION

MATTHEW ONYSHKO and
JESSICA ONYSHKO,

        PLAINTIFFS,

VS.                                  NO. 2014-3620

NATIONAL COLLEGIATE ATHLETIC
ASSOCIATION,

ENTRY OF OPINION, ORDER, DECREE,
ADJUDICATION OR JUDGMENT FILED 9-30-19

MAILED 10-1-19

        DEFENDANT.

TO J. Luckasevic Esc

**OPINION AND ORDER
ADDRESSING POST-TRIAL MOTIONS**

At issue are the post-trial motions of the Plaintiffs, Matthew and Jessica

Onyshko (Onyshko's), who challenge multiple rulings of this trial court. On June

27, 2014, Mr. Onyshko, a former California University of Pennsylvania football

player who is afflicted with Amyotrophic Lateral Sclerosis (ALS), filed this

negligence action against the National Collegiate Athletic Association (NCAA).

He and his wife allege that repetitive head trauma, Mr. Onsyshko sustained while

playing college football, is a factual cause of his diagnosed ALS and related

symptoms. On May 23, 2019, following a trial that spanned four weeks, a jury

determined that the NCAA was not negligent.

The Onyshko's filed timely post-trial motions that assert multiple[1] grounds for relief. They specified the following errors:

1. The exclusion of testimony and evidence regarding CTE[2], related scientific and medical literature to include the opinions of Dr. Bennet Omalu that Mr. Onyshko's future autopsy will reveal that he has suffered CTE and that he has a presumptive diagnosis of CTE-ALS and/or CTME;

2. Permitting the NCAA to offer evidence of the athletic training practices of California University of Pennsylvania during the years 1999 to 2003, to include allowing the testimony of Dr. William Biddington;

3. The denial of *Frye* challenges to the testimony and opinions of the NCAA's medical experts Dr. Robert Hargbaugh and Dr. Stanley Appel;

4. The failure to provide any agency, non-delegable duty and "heeding presumption" instructions to the jury;

5. Not granting the Onyshko's directed verdict motion concerning the NCAA's assumption of the risk defense and not providing a "no assumption of the risk" jury instruction;

---

[1] The Onyshko's motion detailed seven errors, however, in their brief and at argument they also contended that the process of jury selection was flawed, non-compliant with Wash L.R.C.P. 221 and deprived them of a fair and unbiased panel.
[2] Chronic Traumatic Encephalopathy.

6. Not permitting the Onyshoko's leave to present deposition testimony of Mr. Onsyhko's college teammates;

7. Not declaring a mistrial after the closing argument of the NCAA and/or failing to provide limiting instructions regarding arguments which introduced facts not evidence; and

8. Conducting jury selection contrary to Wash L.R.C.P. 221 and depriving the Onyshko's of a fair and unbiased jury panel.

The Onyshko's seek a new trial.

## POST-TRIAL MOTIONS NEW TRIAL STANDARD

In order to obtain a new trial, however, the moving party must demonstrate in what way trial error caused an incorrect result. Clack v. Commonwealth of Pa., Dep't of Transp., 710 A.2d 148 (Pa.Cmwlth.1998). To determine whether a Plaintiff is entitled to a new trial follows a two step process. First, a court must decide whether one or more mistakes occurred at trial. Harman ex rel. Harman v. Borah, 562 Pa. 455, 756 A.2d 1116 (2000). Second, if a mistake occurred, a court must determine whether the mistake is a sufficient basis for granting a new trial. Com., Dep't of Gen. Servs. v. U.S. Mineral Products Co., 927 A.2d 717, 723 (Pa.Cmwlth. 2007), aff'd, 598 Pa. 331, 956 A.2d 967 (2008). Further, post-trial relief may not be granted unless the grounds therefore were raised at trial. Pa.

R.C.P. 227.1(b)(1), *supra,* post-trial relief may not be granted unless the motion states how the grounds for relief were asserted at trial. Bennyhoff v. Pappert, 790 A.2d 313, 317 (Pa. Super. 2001)

## EXCLUSION OF CTE EVIDENCE-FRYE

This trial court's April 12, 2019 Opinion and Order addressed, at length, a *Frye* challenge to Dr. Bennet I. Omalu, a board certified anatomic, clinical, forensic and neuropathologist who also holds a Master Degree in Public Health in Epidemiology. [3] The 23 page Opinion and Order is incorporated by reference herein.

To reiterate briefly, in a May 26, 2016 report, Dr. Omalu indicated that Mr. Onyshko's exposure to repetitive blunt force traumas and blows of the head while playing college football was a "significant contributory factor" to his development of symptoms and a "presumptive diagnosis" of ALS. Dr. Omalu further offered that based on his prior experience and discovery of CTE in football players, "if and when" Mr. Onyshko dies, Dr.Omalu's examination will reveal a "definitive diagnosis of CTME."[4] Dr. Omalu then concluded that Mr. Onyshko is suffering from CTME or CTE-ALS. (See Ex. D, p. 6 of Plaintiff's Brief in Opposition to NCAA Motion to preclude testimony of Dr. Omalu)

---

[3] Dr. Omalu's qualifications are extraordinary and well demonstrated that he has led the field in CTE research.
[4] Chronic Traumatic Myelo-Encephalopahty.

Where a party seeks to introduce novel scientific evidence, *Frye* requires *that party*, the proponent, to "demonstrate to the trial court that the relevant scientific community has reached general acceptance of the principles and methodology employed by the expert witness before the trial court will allow the expert witness to testify regarding his conclusions. Stange v. Janssen Pharm., Inc., 179 A.3d 45, 53–54 (Pa. Super. 2018), reargument denied (Mar. 16, 2018) and Betz v. Pneumo Abex, LLC, 615 Pa. 504, 547, 44 A.3d 27, 54 (2012).

In this instance, the *Frye* hearing record did not permit this trial court to conclude that Dr. Omalu utilized a generally accepted methodology for the diagnosis of CTME or CTE-ALS in Mr. Onyshko, a living person. Dr. Omalu **did not testify** at the *Frye* hearing. The Onyshko's offered **no testimony** from its other experts that supported Dr. Omalu's methodology for diagnosing CTE in the living. The reports and scientific articles presented by the Onyshko's confirmed the testimony of Dr. Stanley Appel that CTE is an autopsy diagnosis. According to Plaintiff's expert Dr. Julie Scwartzbard, a neurologist whose report included a review of 53 scientific articles concerning ALS and its causal link to repetitive head trauma, "predictions" of CTE pathology are "moot" because pathology is not available. The studies and peer reviewed articles, cited by Dr. Schwartzbard, well

established, that *in the aggregate*[5]: there is a lack of large scale clinicopathologic studies and consensus regarding diagnostic criteria for CTE in a living person; that identifying biomarkers to aid in the pre-mortem diagnosis of CTE remains a work in progress and that an "in vivo" diagnosis of CTE is not considered accurate or reliable. [6]

The Plaintiffs' claim that this trial court's *Frye* ruling precluded them from explaining the true mechanism of Matthew Onyshko's injury. Factually, the trial record does not support this assertion. At an April 25, 2019 evidentiary argument, this trial court ruled "...I'm not going to eliminate references to materials that experts relied upon simply because they mention the word CTE." (H.T. 4/25/19 p. 41 lines 22-24)[7] Consistent with this ruling, this trial court permitted the

---

[5] An expert witness may rely upon scientific literature "in the aggregate" to support the existence of a causal relationship. See Walsh, 191 A.3d 847-848

[6] See pages 20-22 of this trial court's 4/12/19 Opinion and Order. See also p. S465 to S466 of Ex. T to Plaintiff's Brief in Opposition to Defendant NCAA's Motion to Preclude, a portion of an article entitled "Long-term Consequences of Repetitive Brain Trauma: Chronic Traumatic Encephalopathy" which included as authors Dr. Robert Cantu, a testifying expert for the Onyshko's and Dr. Ann McKee of Boston University. The article included the following comment " ...it should not be surprising that many critical questions remain regarding CTE. These questions include...How can CTE be detected and diagnosed accurately during life?"

[7] Counsel for the Onyshko's understood the distinction this trial court drew and well articulated it in argument. Counsel summarized:

> So at least when you were talking, Your Honor, you were saying you were concerned about the label. It sounded like you were saying originally about the breadth of studies, that they overlap, talk about neurodegenerative diseases in general, but what I understand you to be doing is saying we can't say Matt Onyshko is or should be diagnosed with CTE, but you're not precluding all the historical studies and discussions about neurodegenerative disease that include CTE.

See H.T. 4/25/19 p. 57 Lines 6-16.

Onyshko's to offer extensive argument and evidence regarding the mechanism of Mr. Onsyhko's injury. At a sidebar regarding scientific literature to be discussed as part of Dr. Omalu's testimony, this trial court reiterated:

> We haven't sanitized this trial of everything regarding CTE. I'm trying to keep it so it doesn't become the focus of this trial because it shouldn't be, but there is a crossover in the science, and in that particular article, they reference both CTE and ALS in the same sentence.

(T.T. 5/8/19, p. 781 lines 9-15).

The Onyshko's were permitted to offer evidence concerning repetitive trauma in football to include concussive and sub-concussive impacts and their causal relationship to the development of long-term neurodegenerative disease. The following is a list of some but not all of the argument and evidence the Onyshko's offered regarding the mechanism of Mr. Onsyshko's injury:

a) In opening statement to argue that the NCAA's Chief Medical Officer Brian Hainline's statement that ALS and CTE are both neurodegenerative diseases and there is a link between football and degenerative brain disorders like CTE and ALS. (See T.T. 5/3/19 p. 41-42);

b) In opening to refer to Dr. Hainline's testimony regarding repetitive impacts on the brain of a football player and to argue "That's why we

have 52 NFL players with ALS. That's why we have Matt Onyshko with ALS." (See TT 5/3/19 p. 43 lines 9-21);

c) In opening to share with the jury in great detail the impact repetitive head trauma, including but not limited to subconcussive blows from football, cause the human brain (TT. 5/3/19, p. 68-74, 79-88,);

d) To utilize an animation during the testimony of Dr. Julie Schwartzbard to demonstrate the mechanism of injury Mr. Onyshko sustained (T.T. 5/7/19 p. 454-473);

e) To cite scientific studies and peer reviewed articles that demonstrate a link between trauma and ALS (T.T. 5/7/19 p. 474-486);

f) To present expert opinions that playing college football increases the risk of ALS and did so for Mr. Onyshko (T.T. 5/7/19 p. 486 lines 17-19, 500 lines 18-20, TT 5/8/19 p. 852-853);

g) To provide a historical summary starting with Hippocrates in 400 B.C. regarding "the knowledge about neurodegenerative disease and repetitive head trauma" that included references to "commotion cerebri," concussion, "punch drunk syndrome," "dementia pugilistica," ALS, and Parkinson's Disease, motor neuron disease, and chronic traumatic encephalopathy (CTE) and the reasonableness of the NCAA's response

to such information; (T.T. 5/8/19, p. 802-815, T.T. 5/9/19 p.1039-1041, and 1044-1049);

h) To discuss scientific literature that addressed the impact of repetitive head injury and "what happens to the brain and spinal cord as a result" to include pathology findings of TDP-43 (mis-folded) and abnormal Tau proteins pathology (T.T. 5/7/19 p. 486-492, 5/8/19 p. 762 Lines 17-25, p.817 line 16 – 819 line 14, p. 822- 825, and 839 lines 6-24);

i) To offer expert opinion concerning repetitive head trauma, an ensuing "prion like process" and the development of neurodegenerative diseases (T.T. 5/7/19 p. 522-526);

j) To offer expert opinion testimony concerning the mechanism of a concussion for a football player and the permanent damage caused to the brain (T.T. 5/9/19, p. 1000-1003);

k) To offer expert opinion that concussions increase the risk of long-term neurodegenerative disease (T.T. 5/9/19, p. 1028);

l) To offer expert testimony explaining the difference between concussive and sub-concussive hits (T.T. 5/9/19, p. 1029);

m) To offer evidence as to the number of sub-concussive blows a college football player encounters in an average season (T.T. 5/9/19, p. 1029);

n) To discuss studies that found post-mortem evidence of CTE in athletes who never reported having a concussion during their lifetime (T.T. 5/9/19, p. 1030-31);

o) To explain that sub-concussive blows cause metabolic and structural changes in the brain (T.T. 5/9/19, p. 1031 lines 8-12);

p) To offer expert opinion that the NCAA failed to educate, supervise and protect Mr. Onyshko and other athletes to know, understand and appreciate the risks of repetitive head impacts (T.T. 5/9/19, p. 1076-1077 and 1163-1164);

q) To cross-examine defense experts with regard to CTE resulting from recurrent blows to the head, that Dr. Omalu was awarded a medal from the AMA for his work on chronic traumatic encephalopathy and with regard to literature establishing a causal link between concussions and later in life neuropathologies to include CTE and ALS (T.T. 5/13/19, p. 1474-1478, 1481, and 1483, T.T. 5/16/19 p. 2077-78, 2086-2089, and 2093-2094);

r) To impeach defense experts with the use of scientific articles that described the "molecular cascade" that results in ALS (T.T. 5/13/19, p. 1484);

s) To offer rebuttal that included expert testimony that the repetitive nature of trauma to Mr. Onyshko's brain and spine put him at a higher risk of developing neurodegenerative diseases like ALS (T.T. 5/20/19, p. 2287-2290); and

t) To make closing arguments that discussed the higher incidence and increased risk of neurodegenerative disease in football players, the increased markers of neuronal and axonal Tau injury in non-concussed athletes as revealed through many studies and scientific papers (T.T. 5/22/19 p. 2682-2698).

Clearly, the trial was not sanitized of all references to CTE. As the above cited portions of the trial transcript indicate, the Onyshko's had a full and fair opportunity to present their evidence regarding the "state of the art", the NCAA's alleged negligence, the mechanism of injury to Mr. Onyshko and expert opinions regarding the cause of Mr. Onyshko's ALS.

The Onyshko's presently assert that the limits this trial court placed on CTE evidence hampered Dr. Omalu in responding to cross-examination that confronted him with "Fact Sheets" from the CDC, Cleveland Clinic and the NIH. However, the Onyshko's did not object to the use of such "Fact Sheets." (H.T. 5/8/19 p. 873 lines 16-25, p. 877 lines 1-23, 885-886) Second, on cross-examination, Dr. Omalu explained that a 2016 paper published by the NIH established the "work" he had

done regarding the link between physical trauma and neurodegenerative diseases that included ALS. (H.T. 5/8/19, p. 890) Third, on re-direct of Dr. Omalu, the Onyshko's made no proffer of the 2016 NIH article or other CDC publications that the Onyshko's now contend address CTE and support Dr. Omalu's testimony. (See H.T. 5/8/19, p. 921-924)[8]

Under these circumstances, the Onyshko's claims appear undeveloped, waived and lacking a specific proffer. As Justice Wecht recently commented:

> Trial lawyers waive claims, objections, and issues all the time, and do so upon all sorts of rationales.[14] These waivers may occur for countless strategic or tactical reasons, or may be based upon intervening developments in the trial record, or may reflect simple inadvertence or error. Our trial courts must be free to accept such unequivocal statements of counsel **as consequential and binding.**

Jones v. Ott, 191 A.3d 782, 791–92 (Pa. 2018) (Emphasis Added). Without a more specific indication of where in the voluminous trial record such grounds for relief were asserted, this trial court is unable to conclude that it committed such error at

---

[8] The Onyshko's also argue that materials on the NIH and CDC websites support Dr. Omalu's opinion that CTE may be diagnosed in the living. The Onyshko's reference in footnotes 12 and 13 of their motion are very broad. In an effort to further explore the citation this trial court did find in a CDC "Heads Up" article titled Chronic Traumatic Encephalopahty (CTE) the following statement "To diagnose CTE, doctors check the brain of a person after he or she dies." Further, the Onyshko's do not point to any portion of the voluminous trial record that includes this court's ruling that the materials cited in footnotes 12 and 13 of their motion are inadmissible.

trial. Post-trial relief must be denied on this assignment of error regarding Dr. Omalu's cross-examination.

For these reasons, this trial court finds that no error occurred with regard to the admission and exclusion of "CTE" evidence such that a new trial should be granted.

## ADMISSION OF TESTIMONY DR. HARBAUGH AND DR. APPEL

At trial, the Onyshko's raised *Frye* challenges to both Dr. Robert Harbaugh, Chair of the Department of Neurosurgery at Penn State Hershey Medical Center, and Dr. Stanley Appel, Chairman of the Department of Neurology at Houston Methodist Hospital. (T.T. 5/16/19 p. 1526, and T.T. 5/16/19, p. 2134-2135) Though both expert witnesses testified at a pre-trial *Frye* hearing on January 25, 2019, the Onyshko's *Frye* objections were not made or filed until trial was underway. In denying the Onyshko's motions, this trial court relied upon the complete record to include the *Frye* hearing, the trial testimony of both experts and written filings of the parties.

The Onyshko's broadly challenge both Dr. Harbaugh's qualifications and the methodology he employed to reach his conclusions. Pennsylvania adheres to a liberal standard for the qualification of an expert witness. When determining whether a witness may testify as an expert, a trial court is to examine whether the witness has any reasonable pretension to specialized knowledge on the subject

under investigation that will aid the trier of fact and has used a methodology generally accepted in the "relevant" field. Callahan v. Nat'l R.R. Passenger Corp., 979 A.2d 866, 875–76 (Pa. Super. 2009) and Pa.R.E. 702.

In this instance, Dr. Harbaugh is a board certified neurosurgeon who: i) is the academic chair overseeing clinical research in neurosurgery at Penn State's Hershey Medical College; ii) is experienced in utilizing biostatistics and epidemiological reports; iii) was a member of the NFL's Head, Neck and Spine Committee for which he headed the subcommittee on data analysis; iv) serves on the NIH Federal Interagency Traumatic Brain Injury Research Informatics and strategic vision committee; and v) has written scientific articles concerning the recording of brain activity "real-time" in football players. (T.T. 5/13/19, p. 1333-1353)

Further, Dr. Harbaugh used the *Bradford-Hill*[9] methodology in arriving at his opinion that the cause of ALS is unknown and that existing data did not make it "reasonable" for the NCAA to have told Mr. Onyshko that he was at an increased risk of developing ALS. (H.T. 1/25/19 p. 39-46, T.T. 5/13/19 p. 1383-1384). Such methodology has been recognized as being generally accepted. See Walsh v.

---

[9] "The Bradford–Hill criteria were developed as a means of interpreting an established association based on a body of epidemiologic research for the purpose of trying to judge whether the observed association reflects a causal relation between an exposure and disease." Soldo v. Sandoz Pharms. Corp., 244 F.Supp.2d 434, 514 (W.D.Pa. 2003)

BASF Corp., 191 A.3d 838, 844 (Pa. Super. Ct. 2018), reargument denied (Aug. 21, 2018), appeal granted, 203 A.3d 976 (Pa. 2019) and Hutz v. Workers' Comp. Appeal Bd. (City of Philadelphia), 147 A.3d 35, 43 (Pa.Cmwlth. 2016).

For these reasons, the admission of Dr. Harbaugh's testimony was not error. Dr. Harbaugh possessed specialized knowledge that assisted the jury in understanding matters of general causation and "state of the art." Dr. Harbaugh employed a generally accepted methodology to determine whether an association reflects a causal relationship.

The Onyshko's charge that no methodology or explanation supports Dr. Appel's opinions. However, at trial, an adequate foundation was laid to establish both Dr. Appel's methodology and explanation. Dr. Appel reviewed numerous medical records regarding the diagnosis and treatment of Mr. Onsyhko's ALS. (T.T. 5/15/19, p. 2029-2031) Dr. Appel's testified regarding his extensive experience with diagnosis and treatment of ALS patients. He holds an endowed Chair for the treatment and research of ALS at the Houston Methodist Neurologic Institute. He has held numerous faculty appointments and positions at university hospitals to include the Duke Medical Center and Houston Methodist. He actively participates in ALS research and treats approximately 25 ALS patients per week. (T.T. 5/16/19 p. 2004,-2007)

Where a physician analyzes a patient's medical records and relies upon his personal expertise to reach a conclusion regarding the source of the patient's injuries, such methodology is "generally accepted" and *Frye* is not applicable. Tucker v. Cmty. Med. Ctr., 833 A.2d 217, 224 (Pa.Super.2003) (review of medical records to reach conclusion regarding source of plaintiff's injuries not novel as cited in Cummins v. Rosa, 846 A.2d 148, 151 (Pa. Super. 2004).

Having a thorough knowledge of Mr. Onshyko's medical history and relying upon on his extensive training and experience with ALS, Dr. Appel reached an opinion on where Mr. Onyshko's symptomology started and whether it could be related to his playing college football. Such methodology is generally accepted and admissible. See Cummins v. Rosa, 846 A.2d at 151.

**CALLING DR. HARBAUGH OUT OF TURN**

At trial and in their post-trial motion brief, the Onshyko's assert this trial court erroneously permitted Dr. Harbaugh to be called to testify out of order. After six days of testimony from the Onyshko's and before they rested, this court allowed Dr. Harbaugh to be called out of turn. (See T.T. 5/13/19) Permitting an expert witness to be called out turn is not grounds for error. Pa.R.Civ.P. 223, Bunting v. Sun Co., Inc., 434 Pa.Super. 404, 413, 643 A.2d 1085, 1090 (1994) and Pa.R.E. 611. In this instance, the Plaintiffs' three (3) medical expert witnesses, Drs. Schwartzbard, Omalu and Cantu had all testified. Dr. Harbaugh's testimony was

received on Monday after a weekend recess. Accepting Dr. Harbaugh's testimony "out of turn" was not a surprise to the Onyshko's. (T.T. 4/29/19 p. 25 and T.T. 5/10/19 p. 1308-1311) Prior to the testimony, this trial court instructed the jury of the ruling, its necessity and that the Onyshko's would be offering more evidence. (T.T. 5/13/19, p. 1331)

No error on this point is evident.

## LATE DISCLOSURE OF DR. APPEL'S TESTIMONY

Immediately prior to Dr. Appel taking the stand, the Onsyshko's objected to slides the NCAA intended to use and Dr. Appel's opinion that Matthew Onyshko's ALS started in his hands. (T.T. 5/16/19, p. 1969-1970). Following an extended argument that included a review of slides to be published during Dr. Appel's testimony, this trial court permitted Dr. Appel to explain how Mr. Onyshko's clinical presentation supported the view that football did not cause Mr. Onyshko's ALS. (T.T. 5/16/19 p. 1971-2001 and 2039-2040) The Onyshko's objected that Dr. Appel was offering a new opinion that was not within the "four corners" of his pre-trial report. (T.T. 5/16/19 p. 2043)

Specifically, Dr. Appel stated that ALS may start in the lower motor neuron out at the neuromuscular junction. (T.T. 5/16/19 p. 2040) Dr. Appel indicated that Mr. Onyshko's symptoms began in his hands. (T.T. 5/16/19 p. 2043-44) In a pre-trial narrative report, Dr. Appel stated "His (Mr. Onyshko's) *first symptoms* were

likely those of fasciculations noted in his arms and chest in 2001, and complaints of 'his hands not being particularly strong as a junior in college." (Ex. 4 to 1/25/19 Hearing) (Emphasis Added)

In determining whether an expert's trial testimony falls within the fair scope of his pre-trial report, a trial court must determine whether the report provides sufficient notice of the expert's theory to enable the opposing party to prepare a rebuttal witness. Feden v. Consol. Rail Corp., 746 A.2d 1158 (Pa.Super.2000). Under this analysis, an expert's trial testimony may be found unobjectionable whenever it could reasonably have been anticipated from the content of the expert's pre-trial report. Butler v. Kiwi, S.A., 412 Pa.Super. 591, 604 A.2d 270 (1992). An expert's trial testimony that constitutes a reasonable explanation or even an enlargement of the expert's written words may be deemed to fall within the coverage of "fair scope." Daddona v. Thind, 891 A.2d 786, 805–06 (Pa.Cmwlth. 2006). Dr. Appels' testimony regarding where Mr. Onyshko's ALS symptomology began is clearly within fair scope of Dr. Appel's July 14, 2016 report.

Further, Dr. Appel's testimony was fair rebuttal to the opinions and testimony provided by Plaintiffs' experts, Dr. Schwartzbard and Dr. Omalu. This trial court permitted Dr. Schwartzbard to use an animation that had only been shared with the NCAA after trial began. The animation was used to explain the

mechanism of Mr. Onyshko's injury and how his ALS progressed from the brain to rest of the body. (T.T. 5/7/19 p. 463-473) Similarly, Dr. Omalu described the cause and course of Mr. Onyshko's ALS. (T.T. 5/8/18 p. 818-825)

Where a plaintiff introduces certain evidence in his case-in-chief, he cannot later deprive his opposition of the privilege of denying it. See Leaphart v. Whiting Corp., 387 Pa.Super. 253, 564 A.2d 165 (1989). Thus, an expert's opinion offered in response to other testimony presented at trial need not be addressed in the expert's report. Earlin v. Cravetz, 264 Pa.Super. 294, 399 A.2d 783 (1979) as cited in Daddona v. Thind, supra.

For these reasons, this trial court finds that no error, that amounts to a sufficient basis for granting a new trial, occurred with regard to the admission of Dr. Harbaugh and Dr. Appel's testimony.

## DR. BIDDINGTON AND CALIFORNIA UNIVERSITY PRACTICES

The Onyshkos argue that the NCAA impermissibly proffered evidence of California University's athletic training practices from 1999-2003, to include the testimony of Dr. William Biddington. The Onyshko's sought to preclude any testimony that would suggest that California University used the "gold standard" for athletic training and management of concussions during the years Mr. Onyshko played. Specifically, the Onyshkos argue that such evidence lacks relevance pursuant to Pa.R.E. 401 and 403. The Onyshkos specifically challenged the

admission of Dr. Biddington's testimony due to a lack of personal knowledge pursuant to Pa.R.E. 602, and a "lack of expert support" pursuant to rule 702.[10]

Regarding relevance, the Onyshkos reiterate their argument asserting that "the actions and/or inactions of California University of Pennsylvania have absolutely nothing to do with this case." (Motion for Post-Trial Relief ¶52) Plaintiffs assert that the introduction of the actions or inactions of California University were "empty chair" arguments. (Motion for Post-Trial Relief ¶57)

Pa.R.E. 401 establishes that evidence is relevant if "(a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." To be relevant and admissible, evidence need not be conclusive. Com. v. Foley, 2012 PA Super 31, 38 A.3d 882, 890 (2012). Evidence offered for one purpose need not be excluded merely because it is inadmissible for another purpose. Orlando v. Herco, Inc., 351 Pa. Super. 144, 505 A.2d 308 (1986) Under Pa.R.E. 403 "the court may exclude

---

[10] These arguments were preserved both prior to and during trial. At a pre-trial limine argument on March 8, 2019, the Onyshko's objected to testimony regarding documents that could not be produced. At that time, the Onyshko's Counsel stated "I'm talking about a specific document that simply doesn't exist. **They can testify to what they did, what they recall doing,** but to say that this was based on some document that we had a policy on, it's just not there." (H.T. 3/8/19 p. 113) On April 5, 2019, the Onyshko's Counsel expanded their relevancy objection to preclude any testimony that would suggest that California University used the "gold standard" for athletic training and management of concussions during the years Mr. Onyshko played. (H.T. 4/5/19, p. 26-43) The Onyshko's renewed their objections the day prior to Dr. Biddington's testimony. (T.T. 5/14/19 p. 1588-1622) Again on May 15, 2019 Onyshko's objected to Dr. Biddington's testimony prior to, during and immediately after his testimony. (T.T. 5/15/19 p. 1698-1754)

relevant evidence if its probative value is outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Virtually all evidence is prejudicial to one party or another, but the prejudice must be unfair to be excluded under Pa.R.E. 403. Com. v. Treiber, 582 Pa. 646, 874 A.2d 26 (2005). "Exclusion of evidence on grounds that is prejudicial 'is limited to evidence so prejudicial that it would inflame the jury to make a decision based upon something other than the legal propositions relevant to the case'" Com. v. Flamer, 2012 PA Super 186, 53 A.3d 82, 89 (2012) (citing Commonwealth v. Foley, 38 A.3d 882, 891 (Pa.Super.2012))

Throughout this case, the Onyshkos argued that the NCAA failed to have "return to play" guidelines and failed to provide warnings to athletes regarding the risks of concussions and repetitive head trauma. The Onyshkos argued such failures increased the risk for Mr. Onyshko to develop ALS. However, NCAA's counsel argued that,

> if they're claiming that the failure to have a concussion management protocol, which is the implication of all the testimony, was a proximate cause of this injury, this takes away factual cause if that's their claim.... That's what Cantu was on the witness stand for hours testifying about, there should have been a concussion management protocol.
> Well, there was. And if that's a causative factor in this injury, then that comes out of the case, because there was a concussion management protocol there that was being followed.

(May 14, 2019 Trial Transcript pages 1616-1617) In this instance, the claim that the NCAA proffered California University as an "empty chair defendant" is not supported by the record.[11] In other words, the NCAA argued that this evidence was relevant to causation, an essential element of negligence.

For a party to prevail in a negligence action, a plaintiff must prove that the defendant "owed a duty of care to the plaintiff, that duty was breached, **the breach resulted in the plaintiff's injury**, and the plaintiff suffered an actual loss or damages." Merlini ex rel. Merlini v. Gallitzin Water Authority, 602 Pa. 346, 980 A.2d 502, 506 (2009) as cited in Collins v. Philadelphia Suburban Dev. Corp., 179 A.3d 69, 73 (Pa. Super. Ct. 2018) (Emphasis Added). Evidence that shows an alleged breach of a duty of care resulted in a plaintiff's injury is more or less probable is of consequence in determining a negligence action.

Here, the actions of California University are relevant to causation. The Plaintiffs assert that the NCAA's failure to warn Mr. Onyshko and the NCAA's lack of return to play guidelines and concussion management programs increased

---

[11] Nonetheless, authority exists to permit such defenses to be offered at trial. "An 'empty chair' defendant may exculpate the other tortfeasors totally if they show the 'empty chair' defendant was *solely* liable. However, someone not sued cannot be considered a joint tortfeasor for purposes of reducing the verdict." Dorothy Rothermel, Ex'x of the Estate of Leland Rothermel, dec'd. v. Owens-Illinois, Inc. et al., 070946., 1992 WL 1071407 (Pa. Com. Pl. July 8, 1992)

the risk that Mr. Onyshko could develop a neurodegenerative disease such as ALS. Mr. Onyshko played at California University of Pennsylvania between 1999 and 2003. Accordingly, what warnings were given to Mr. Onyshko and what return to play or concussion management protocols were in place is relevant to determine causation. The arguments made by the Onyshko's are similar to a litigant in a motor vehicle case asserting that a trucking company is negligent for failing to equip a truck with a governor that prevents the truck from traveling over 50 mph, but then tries to exclude testimony that the truck never traveled higher than 30 mph at all times material to the collision.

The NCAA's evidence regarding California University training practices was admissible on grounds other than causation. Evidence not otherwise admissible, may be introduced if the opposing party "opens the door" by presenting evidence that creates a false impression to the contrary. Duchess v. Langston Corp., 709 A.2d 410, 412 (Pa.Super.1998), affirmed, 564 Pa. 529, 769 A.2d 1131 (2001). Once the door is opened, a party may introduce evidence reasonably related in scope to the substance of the offending testimony. Gaudio v. Ford Motor Co., 976 A.2d 524, 544 (Pa.Super.2009), appeal denied, 989 A.2d 917 (Pa.2010).

The Onyshko's offered testimony about the lack of education and warnings California University football players received when Mr. Onyshko played there.

Dan Smith, Mr. Onyshko's teammate, indicated that Coach Mike Kolakowski addressed the team regarding safety through "the handbook and stuff like that." (T.T. 5/8/19 p. 630) Mr. Smith testified that Coach Kolakowski did not address concussions with the team. (T.T. 5/8/19, p. 631) Mr. Smith stated that the assigned athletic trainer, Mr. Michael Steinagel, did not discuss concussions with the team. (T.T. 5/8/19, p. 633-634) However, on cross-examination, Mr. Smith recalled preseason meetings where injuries were discussed and the California University Training Staff was present. (T.T. 5/8/19, p. 646-650). Mr. Onyshko testified to similar matters.[12]

The NCAA's evidence that supported its "gold standard' argument rebutted the testimony of Mr. Smith and Mr. Onyshko. Mr. Steinagel testified that during preseason for the football team he specifically read instructions to the football team concerning concussions in their preseason meeting. (Steinagel Deposition Pages 34-35) Mr. Steinagel testified that while serving as the assigned athletic Trainer for California University, he followed the established consistent with those found in the Principles of Athletic Training. (Steinagel Deposition Pages 36-38). Dr.

---

[12] Mr. Onyshko testified that California University trainers and coaches did not tell him about concussion symptoms, or brain disease or ALS. (T.T. 5/6/19 p. 277-278) Mr. Onyshko indicated that the player's handbook did not discuss concussions or brain disease. (T.T. 5/6/19, p. 278) However, on cross-examination, Mr. Onyshko, testified that he recalled Mr. Steinagel, preseason team meetings discussing training, the handbook from Coach Kolakowski, and that the handbook included a requirement to report all injuries. (T.T. 5/6/19, p. 302-303)

Biddington, the Chairman of the Athletic Training Program during those years, testified that California University's athletic training practices were "based on the Principles of Athletic Training, and included following tools recommended by Dr. Robert Cantu. (T.T. 5/15/19, p. 1732 and 1737) Dr. Biddington also recalled, that in 1997 he went over responsibilities of being a head athletic trainer with Mr. Steinagel. Those responsibilities included reviewing with the football team the "practices or policies, unwritten policies specifically discussing management of concussion issues, what our relationship was with the team physician and dealing with those." (T.T. 5/15/19, p. 1731 and 1735)

Being evidence that tended to corroborate Mr. Steinagel, Dr. Biddington's testimony was relevant. A party is generally entitled to introduce additional evidence of material facts as to which evidence has already been produced provided that such evidence tends to confirm, corroborate, or otherwise strengthen and add force and probability to the prior evidence. Duffy v. Griffith, 134 Pa. Super. 447, 4 A.2d 170 (1939).

In summary, the evidence submitted by the Onyshko's regarding California University's inaction made the evidence of the NCAA regarding California University's training practices relevant. For these reasons, this trial court finds that no error occurred with regarding the admission of such evidence.

**REBUTTAL DEPOSTION TESTIMONY OF TEAMMATES**

The Onyshko's argue that this trial court erred by excluding evidence that would have rebutted Dr. Biddington and Mr. Steinagel's testimony. During rebuttal, the Onyshko's sought to introduce the deposition testimony of three teammates, Robert Jurkiewicz, Brandon LeDonne and Christopher McKnight. (T.T. 5/20/19, p. 2332)

Though the deposition testimony of several witnesses was "read in" by both parties during their respective cases in chief, the testimony of former California of University football players Jurkiewicz, LeDonne and McKnight were not included. The NCAA objected to the Onyshko's "reading in' such witness testimony during rebuttal. The Onyshko's responded that counsel had a stipulation that permitted the witnesses' transcripts to be offered if the teammates did not appear. However, the agreement, set forth in an April 15, 2019 email, did not indicate the NCAA's specific consent to the Onyshko's admission of deposition testimony from these three teammates. Further, no showing was made as to the unavailability of these teammates. (T.T. 5/20/19 p. 2340-2344)

This trial court sustained a hearsay objection finding that the witnesses were not shown to be unavailable. Pa.R.E. 804 allows hearsay testimony if the declarant is unavailable. To be unavailable, the declarant may be exempted by privilege, refuses to testify despite court order, testifies to not remembering, cannot be present due to illness, or absent and the proponent has not been able to procure

their attendance or testimony. Pa.R.E. 804(a). If the declarant is unavailable, former testimony may be admitted. Pa.R.E. 804(b)(1). Before using former testimony, a party must first attempt to enforce a properly served subpoena. Turzai v. Com., Unemployment Compensation Bd. of Review, 102 Pa. Commw. 645, 519 A.2d 567 (1986). The trial court has the discretion to determine the sufficiency of proof of unavailability. Corl v. Kacmar, 391 Pa. Super. 376, 378, 571 A.2d 417, 418 (1990) (citing Katz v. Montague, 181 Pa.Super. 476, 124 A.2d 506 (1956)).

However, at the time, this trial court should have given primary consideration to Pa.R.C.P. 4020 which provides:

> At the trial, any part or all of a deposition, so far as admissible under the rules of evidence, may be used against any party who was present or represented at the taking of the deposition or who had notice thereof if required, in accordance with any one of the following provisions:
>
> (3) The deposition of a witness, whether or not a party, may be used by any party for any purpose if the court finds
> (a) that the witness is dead, or
> (b) that the witness is at a greater distance than one hundred miles from the place of trial or is outside the Commonwealth, unless it appears that the absence of the witness was procured by the party offering the deposition, or
> (c) that the witness is unable to attend or testify because of age, sickness, infirmity or imprisonment, or
> (d) that the party offering the deposition has been unable to procure the attendance of the witness by subpoena, or
> (e) upon application and notice that such exceptional circumstances exist as to make it desirable, in the interest of justice and with due

regard to the importance of presenting the testimony of witnesses orally in open court, to allow the deposition to be used.

Pa.R.C.P. 4020. [13] Where the requirements of Pa.R.C.P. No. 4020 are satisfied, a court "must admit" the deposition. Kuntz v. Firth, 216 Pa.Super. 155, 158, 264 A.2d 432, 433 (1970).

In this instance, the Onyshko's had the burden to meet the Pa.R.C.P. 4020 (a)(3) requirements as to teammates Jurkiewicz, LeDonne and McKnight. Having reviewed the trial record, this trial court is not able to conclude that such burden was met. A trial court commits error by admitting deposition testimony without a showing that one of the conditions under Pa.R.Civ.P. 4020(a)(3) apply. Missett v. Hub Int'l Pennsylvania, LLC, 6 A.3d 530, 544 (Pa. Super. 2010) Where no showing of unavailability or exceptional circumstance is made, a trial court

---

[13] Compare Pa.R.E. 804 which provides:
A declarant is considered to be unavailable as a witness if the declarant:

(1) is exempted from testifying about the subject matter of the declarant's statement because the court rules that a privilege applies;
(2) refuses to testify about the subject matter despite a court order to do so;
(3) testifies to not remembering the subject matter, except as provided in Rule 803.1(4);
(4) cannot be present or testify at the trial or hearing because of death or a then-existing infirmity, physical illness, or mental illness; or
(5) is absent from the trial or hearing and the statement's proponent has not been able, by process or other reasonable means, to procure:
(A) the declarant's attendance, in the case of a hearsay exception under Rule 804(b)(1) or (6); or
(B) the declarant's attendance or testimony, in the case of a hearsay exception under Rule 804(b)(2), (3), or (4).

commits error by admitting deposition testimony into evidence. Hall v. Owens Corning Fiberglass Corp., 779 A.2d 1167, 1171 (Pa.Super.2001)

In conclusion, on this point of asserted error, a mistake occurred. The record shows this trial court considered only Pa.R.E. 804 and not the specific text of Pa.R.C.P. 4020 when determining the admissibility of the proffered depositions. This mistake is not a sufficient basis for granting a new trial because the record demonstrates that the Onyshko's did not meet their burden pursuant to Pa.R.C.P. 4020.

**DIRECTED VERDICT**

At the close of all evidence, the Onyshko's moved for directed verdict.[14] Their Counsel argued that "a party cannot assume a risk of which he has no knowledge." (T.T. 5/20/19, p. 2406) The Onyshko's Counsel reasoned that the NCAA did not warn Mr. Onyshko regarding the risk of developing a neurodegenerative disease. The Onyshko's Counsel requested that the jury not be allowed to take into account Mr. Onyshko's assumption of the risk. (T.T. 5/20/19, p. 2407)

Though the Onyshko's motion was denied on this issue, no assumption of the risk instruction was given to the jury because it was not an issue for them to

---

[14] The first motion for directed verdict addressed the NCAA's statute of limitations defense. Such motion was denied. (T.T. 5/20/19, p. 2399-2406).

decide. (T.T. 5/22/19 p. 2764-2766) Because this dispute involved a claim of negligence, the affirmative defense of assumption of the risk was not for the jury to decide.[15] In a negligence action, a jury is properly **not charged** on the doctrine of assumption of the risk and that issue should not be submitted to the jury. Struble v. Valley Forge Military Acad., 445 Pa.Super. 224, 232, 665 A.2d 4, 8 (1995)[16] Prior to this directed verdict motion by the Onyshko's this court had denied the NCAA's nonsuit motion.

Having done so, a binding instruction to the jury that assumption of the risk was not a defense to the action was unnecessary. This trial court instructed the jury as to the NCAA's duty of care. (T.T. 5/20/19, p. 2766-2768) The jury could not and should not have been invited by this court to consider "assumption of the risk." Such instruction could have confused and distracted the jury from deciding the factual question whether the NCAA breached its duty of care to Mr. Onyshko. In

---

[15] See Pennsylvania Suggested Standard Civil Jury Instructions, 13.220.

[16] "In Howell v. Clyde, 533 Pa. 151, 620 A.2d 1107 (1993) , the Supreme Court abolished assumption of risk as an affirmative defense decided by the jury. The court concluded "to the extent that an assumption of risk analysis is appropriate in any given case, it shall be applied by the court as a part of the duty analysis, and not as part of the case to be determined by the jury." Id. at 162, 620 A.2d at 1112–13. The court preserved the doctrine as an affirmative defense "in cases involving express assumption of risk, or cases brought pursuant to 402A (strict liability theory), or cases in which assumption of risk is specifically preserved by statute." Id. at 162 n. 10, 620 A.2d at 1113 n. 10." Duquesne Light Co. v. Woodland Hills Sch. Dist., 700 A.2d 1038, 1053–54 (Pa.Cmwlth. 1997) See also Staub v. Toy Factory, Inc., 2000 PA Super 87, ¶ 6, 749 A.2d 522, 526 (Pa. Super. Ct. 2000).

this instance, the Onsyhko's Counsel appeared to argue that this court direct the jury that Mr. Onyshko could not assume a risk of developing ALS because the NCAA had **"failed to warn"** him of the risk that his participation in college football could result in his developing ALS.[17]

Binding instructions may not be given if there is a question of fact properly submitted to the jury. Where there is any evidence, which alone would justify an inference of the disputed fact, it must go to the jury, no matter how strong or persuasive may be the countervailing proof. Duquesne Light Co. v. Woodland Hills Sch. Dist., 700 A.2d 1038, 1046 (Pa.Cmwlth. 1997) Such an instruction to the jury could be viewed as a comment on the factual merit of the NCAA's alleged negligence, being its failing to warn of the dangers of repetitive head trauma. This trial court decided not to usurp the jury's authority to determine if the NCAA was negligent.

## NON-DELEGABLE DUTY AND HEEDING PRESUMPTION

The Onsyhko's assert this trial court should have instructed the jury regarding the heeding presumption, "agency and non-delegable duty." Claims of trial court error in jury instructions may be a sufficient ground for a new trial, where a charge as a whole is inadequate or not clear or has a tendency to mislead

---

[17] Counsel stated "...this jury cannot be allowed to take into account Mr. Onyshko's assumption of the risk which is a risk he was not warned about." (T.T. 5/20/19, p. 2407)

or confuse rather than clarify a material issue. Glider v. Com. Dept. of Hwys., 435 Pa. 140, 151–52, 255 A.2d 542, 547 (1969). A charge will be found adequate unless "the issues are not made clear to the jury or the jury was palpably misled by what the trial judge said or unless there is an omission in the charge which amounts to fundamental error." Voitasefski v. Pittsburgh Rys. Co., 363 Pa. 220, 226, 69 A.2d 370, 373 (1949). A new trial should not be granted on the ground of inadequacy of the charge unless there is a prejudicial omission of something basic or fundamental. Sweeny v. Bonafiglia, 403 Pa. 217, 221, 169 A.2d 292, 293 (1961); Giorgianni v. DiSanzo, 392 Pa. 350, 356, 140 A.2d 802, 805 (1958) as cited in Maya v. Johnson & Johnson, 97 A.3d 1203, 1218–19 (Pa. Super. 2014).

This trial court did not instruct the jury on the "heeding presumption." The heeding presumption has been employed in certain toxic tort product's liability disputes. Recently, the Superior Court has explained:

> "[I]n cases where warnings or instructions are required to make a product non-defective and a warning has not been given, the plaintiff should be afforded the use of the presumption that he or she would have followed an adequate warning, and that the defendant, in order to rebut that presumption, must produce evidence that such a warning would not have been heeded." Coward v. Owens–Corning Fiberglas Corp., 729 A.2d 614, 621 (Pa.Super.1999), appeal granted, 560 Pa. 705, 743 A.2d 920 (1999). "If the defendant produces evidence that the injured plaintiff 'was fully aware of the risk of bodily injury, or the extent to which his conduct could contribute to that risk,' the presumption is rebutted and the burden of production shifts back to the plaintiff to produce evidence that he would have acted to avoid the underlying hazard had the defendant provided an adequate warning." Coward, 729 A.2d at 622 (quoting Pavlik v. Lane Limited/Tobacco

Exporters International, 135 F.3d 876, 883 (3d Cir.1998)). Lonasco v. A–Best Products Co., 757 A.2d 367, 377 (Pa.Super.2000), *appeal denied,* 566 Pa. 645, 781 A.2d 145 (2001).

Maya v. Johnson & Johnson, 97 A.3d 1203, 1218 (Pa. Super. 2014). However, the use of the heeding presumption has been very limited in its application by Pennsylvania Courts. See Viguers v. Philip Morris USA, Inc., 837 A.2d 534, 537 (Pa. Super. Ct. 2003), aff'd, 584 Pa. 120, 881 A.2d 1262 (2005), Gronniger v. Am. Home Products Corp., 3584 JUNE.TERM 2003, 2005 WL 3766685, at *5 (Pa. Com. Pl. Oct. 21, 2005) and Moroney v. Gen. Motors Corp., 850 A.2d 629, 634 (Pa. Super. Ct. 2004).[18]

The Onyshko's claim is one of negligence and is not a case involving workplace exposure to asbestos. Though the Onyshko's make a *novel* and compelling argument that the facts of this case meet the basic requirements of the heeding presumption, they do not address the policy implications involved by extending such a presumption to an "increased risk of harm" negligence action.

---

[18] "In *Coward* a distinction was made between other failure-to-warn cases and those involving toxic torts where plaintiffs faced exposure during their employment. It was held that a toxic tort plaintiff need not demonstrate failure-to-warn defect causation by introduction of affirmative evidence. The Court reasoned these plaintiffs are exposed in the course of their employment under circumstances that provided them no meaningful choice of whether to avoid exposure. This so-called "heeding presumption" has been authorized in Pennsylvania only in cases involving workplace exposure to asbestos. *Viguers v. Philip Morris USA, Inc.,* 837 A.2d 534, 537 (Pa.Super.2003)" as cited Moroney v. Gen. Motors Corp., 850 A.2d 629, 634 (Pa. Super. 2004)

"[B]efore a change in the law is made, a court, if it is to act responsibly must be able to see with reasonable clarity the results of its decision and to say with reasonable certainty that the change will serve the best interests of society." Seebold v. Prison Health Servs., Inc., 618 Pa. 632, 654, 57 A.3d 1232, 1245 (2012) In the context of this action, these considerations remain unclear and uncertain for this trial court.

With regard to agency and non-delegable duty instructions, during a charging conference, the Onyshko's Counsel argued:

> ...the NCAA is a principal and the California University and the rest of the institutions are agents so they have to take into account that they are subject to direct liability of Matt Onyshko, they have undertaken the duty to provide for the health and welfare of student athletes or college athletes. They have endeavored to provide information to these schools about that. Their failure to do so and failure to provide information to the schools makes their conduct, or if they take issue with the conduct of the schools, responsible for the injuries sustained.

(T.T. 5/20/19, p. 2538-2539). A requested charge that would convey these arguments was denied.

The Onyshko's did not establish the existence of a principal agent relationship between the NCAA and California University of Pennsylvania. Actual agency exists when a principal, in this case now alleged to be the NCAA, and an agent, here alleged to be California University of Pennsylvania, enter into an

agency relationship. Such a relationship exists with the (1) manifestation by the principal that the agent shall act for him; (2) the acceptance of the undertaking by the agent; and (3) the control of the endeavor in the hands of the principal. Basile v. H & R Block, Inc., 563 Pa. 359, 761 A.2d 1115 (2000) as cited in Tribune-Review Pub. Co. v. Westmoreland Cty. Hous. Auth., 574 Pa. 661, 674, 833 A.2d 112, 119–20 (2003). No such evidence was offered regarding the NCAA and California University of Pennsylvania.

For that reason, a "non-delegable duty" instruction was not necessary. The term "non-delegable duty" merely means that the principal retains legal responsibility for the undertaking of the person/entity to which the principal assigned the non-delegable duty if the entity acted negligently. Scampone v. Grane Healthcare Co., 2017 PA Super 257, 169 A.3d 600, 621 (Pa. Super. Ct. 2017), reargument denied (Oct. 11, 2017), appeal denied, 188 A.3d 387 (Pa. 2018), and appeal denied, 188 A.3d 388 (Pa. 2018) Because no principal agent relationship was established between the NCAA and California University of Pennsylvania, a non-delegable duty instruction was not necessary.

In summary, a new trial should not be granted because this trial court did not mislead the jury or omit from the final charge something basic or fundamental. The Onyshko's neither pleaded nor proved at trial that

California University of Pennsylvania was the agent of the NCAA. This trial court did not committ error in refusing to instruct the jury on "agency and non-delegable duty." Further, the "heeding presumption" is not applicable in a negligence action claiming that the defendant's conduct increased the risk of harm for the plaintiff.

## CLOSING ARGUMENT OF THE NCAA

The Onyshko's assert a mistrial should have been declared after closing argument from the NCAA. In closing argument, counsel may not present facts to the jury which are not in evidence and which are prejudicial to the opposing party. Further, counsel may not comment on evidence to the effect that it removes an issue of credibility from the jury." Young v. Washington Hosp., 761 A.2d 559, 561 (Pa. Super. Ct. 2000). The trial court has the duty to take affirmative steps to attempt to cure harm, once an offensive remark has been objected to. Where the comments of counsel are so offensive or egregious that no curative instruction can adequately obliterate the taint a mistrial is necessary. Siegal v. Stefanyszyn, 718 A.2d 1274, 1277 (Pa.Super.1998) (citations omitted), *appeal denied,* 559 Pa. 693, 739 A.2d 1059 (1999). In this instance, the Onyshko's point to several portions of the NCAA's closing as grounds for a mistrial. The challenged portions included

commentary on evidence presented and a statement of personal opinion by the NCAA's lead trial counsel.

With regard to comments on the evidence presented, this trial court found such argument to be fair comment on the evidence. First, NCAA Counsel argued that California University of Pennsylvania Athletic Trainer, Michael Steinagel read the symptoms of concussion to student athletes, to include Mr. Onyshko, before each season. (T.T. 5/22/19 p. 259, and 2618-2619) By video deposition, Mr. Steinagel testified that he read instructions to the football team regarding the signs and symptoms of concussions and the reporting process and that he and the football training staff followed guidelines as outlined in the Principles of Athletic Training Tenth Edition (Steinagel Depo. P. 34-38). Second, in the context of discussing the testimony of Dr. Ellen Staurowsky, the Onyshko's NCAA governance expert,[19] NCAA counsel stated:

> "They're talking about baseball, wrestling, hockey, pole vaulting, boxing and track. Also football, soccer and rugby. Maybe we should outlaw them all.."

(T.T. 5/22/19, p. 2587). Such argument was fair comment on the body of published information regarding the dangers of head trauma to athletes, Dr. Staurowksy identified as being available to the NCAA prior to

---

[19] (T.T. 5/3/19, p. 139-254)

1999, the start of Mr. Onyshko's participation in college football. Third, in this context of discussing Dr. Robert Cantu's testimony, counsel for the NCAA made the following statement:

> if it's not concussions, as defined by Dr. Cantu's scale, which there is no evidence he ever had, then they're going to talk about repetitive head injury, which is, basically, playing football will be the claim.

(T.T. 5/22/19 p. 2621). This argument was a fair response to the Onyshko's testimony and argument regarding sub-concussive trauma sustained in football. (T. T. TT. 5/3/19, p. 68-74, 79-88 and T.T. 5/9/19, p. 1029). Fourth, with regard to NCAA revenues, NCAA counsel argued:

> One of the things they don't support with that money is football. Football, Division I football. They support Division II and Division III. Division I is run by the conferences, the Southeast conference...that money stays with the conference."

(T.T. 5/22/19 p. 2642-2643) At trial the NCAA presented the testimony of Terry Gronau, Vice President NCAA Division II, who indicated that between 1999 and 2003 the source of NCAA funding was the Division I Men's Basketball Tournament which had yearly revenues of "roughly 360 million." With the exception of five percent of those revenues, such funds were then distributed back to member institutions at the Division I, II and III levels. (T.T. 5/15/19 p. 1793-1796). The argument that the NCAA drew no revenue from football was supported by the evidence presented at trial.

These arguments were not misleading or overly prejudicial. As such, a mistrial was not warranted. <u>Schweikert v. St. Luke's Hosp. of Bethlehem, Pennsylvania</u>, 886 A.2d 265, 270 (Pa. Super. 2005).

The Onyshko's also assert that the NCAA's Counsel improperly interjected his personal opinion and invited the jury to consider wholly irrelevant issues. When addressing punitive damages, the NCAA's counsel stated:

> "they are going to make a big deal about the president got a letter and he let his secretary handle it or they wrote back in 1905 that football is dangerous and there are concussions, **I don't know whether they're thinking you should outlaw football or the NCAA should do something about not allowing people to play football in college,** I'm not sure what their theory is exactly, but they are saying that the way the NCAA acted was in such a way as that you should punish them."

(T.T. 5/22/19 p. 2610). At another point when addressing the testimony of Drs. Schwartzbard and Omalu regarding the causal relationship between antecedent head trauma and ALS, NCAA counsel stated:

> ...they came up with a new disease. You have never seen it in print other than a slide made up by counsel, football ALS.
>
> I challenge anyone to find that in the diagnostic manual or any medical book. Then they changed it a little bit at one point and said trauma ALS. Same challenge. Same question.
>
> If there is such a thing as football ALS, then football should go away. But thankfully there isn't.

(T.T. 5/22/19, p. 2640-2641)

Trial counsel must be expected to advance a spirited argument to support his client's cause, but he may not take unwarranted liberties with the evidence or arouse prejudices by exaggerated accusations. Purcell v. Westinghouse Broadcasting Co., 411 Pa. 167, 184–85, 191 A.2d 662, 671 (1963). In this, instance, the expressions of personal opinion by the NCAA's counsel amount to no more than oratorical flair that is coincident with the adversarial process and attendant to a long trial involving complex science. No liberties were taken with the evidence by these arguments.[20]

Whether to grant a mistrial because of improper remarks of counsel must be determined by the circumstances under which the statement was made and by the precautions taken by the court and counsel to prevent its having a prejudicial effect." Martin v. Philadelphia Suburban Transportation Co., 435 Pa. 391, 394, 257 A.2d 535, 537 (1969) quoting McCune v. Leamer, 383 Pa. 434, 437–38, 119 A.2d 89, 90 (1956). See also: Smith v.

---

[20] As Justice Musmanno well stated:
> There is nothing in the law, and certainly nothing in the history of American forensic appeal, which remotely suggests that a lawyer's summation must be a prosaic and dull affair, devoid of metaphor, empty of simile, and stranger to dramatic, poetical, or sentimental allusion. **So long as no liberties are taken** with the evidence, a lawyer is free to draw such inferences as he wishes from the testimony and to present his case in the light most suited to advance his cause and win a verdict in the jury box.

Contractors Lumber and Supply Co. v. Quinette, 386 Pa. 517, 522, 126 A.2d 442, 444 (1956) as cited in Ruffing v. 84 Lumber Co., 410 Pa.Super. 459, 474, 600 A.2d 545, 552 (1991).

<u>Evans</u>, 421 Pa. 247, 250–51, 219 A.2d 310, 312 (1966); <u>Easter v. Hancock</u>, 237 Pa.Super. 31, 36–37, 346 A.2d 323, 327 (1975). Prior to closing arguments, the jury was instructed that closing arguments were not evidence but should be carefully considered. (T.T. 5/22/19, p. 2579) In closing instructions, the jury was instructed, at the outset, that counsel's personal opinions or beliefs should be disregarded. (T.T. 5/22/19 p. 2762) The jury was further directed to disregard social and political issues and public opinion regarding college athletics. (T.T. 5/22/19 p. 2763)

For these reasons, this trial court finds that a new trial is not warranted due to comments made during the NCAA's closing argument.

**JURY SELECTION**

The Onyshko's assert this trial court committed error[21] in utilizing an individual voir dire method for jury selection.[22] Instead, the Onyshko's assert this trial court should have utilized the "list method" of selection.[23] The Onyshko's

---

[21] Such objections were preserved prior to voir dire. (H.T. 4/25/19 p. 2-12)

[22] This is a method in which peremptory decisions are made one juror at a time, without knowledge of those jurors to come, and the other in which they are made after all jurors have been examined. <u>Com. v. Noel</u>, 629 Pa. 100, 124, 104 A.3d 1156, 1171 (2014)

[23] When the list system is chosen, a battery of potential jurors shall be compiled, the number of which shall be no less than twelve, plus the number of alternatives the trial court has determined should be selected, plus the total number of peremptory challenges for the parties. Initially, no peremptory challenges are permitted. Rather, upon the receipt of the juror questionnaires and

contend the individual method does not comply with Washington County Local Rule L-221. In particular, the Onyshko's charge this trial court should not have required them to utilize peremptory challenges until the jury panel was individually interviewed and all challenges for cause heard and determined.

As a starting point, neither method is constitutionally mandated. For instance, the Pennsylvania Supreme Court has found no constitutional deprivation where a "hybrid" approach combining the individual and list methods was utilized. In so doing, the Majority explained:

> ...the United States Supreme Court explained, "[a]lthough peremptory challenges are valuable tools in jury trials, they 'are not constitutionally protected fundamental rights; rather they are but one state-created means to the constitutional end of an impartial jury and a fair trial.' " J.E.B. v. Alabama ex rel. T.B., 511 U.S. 127, 137 fn. 7, 114 S.Ct. 1419, 1426 fn. 7, 128 L.Ed.2d 89 (1994) (citing Georgia v. McCollum, 505 U.S. 42, 57, 112 S.Ct. 2348, 2358, 120 L.Ed.2d 33 (1992)). See also Commonwealth v. Wharton, 530 Pa. 127, 144, fn. 6, 607 A.2d 710, 719 fn. 6 (1992); Commonwealth v. Lesko, 553 Pa. 233, 253, 719 A.2d 217, 227 (1998). States may withhold peremptory challenges "altogether without impairing the constitutional guarantee of an impartial jury and a fair trial." McCollum, 505 U.S. at 57, 112 S.Ct. at 2358; Commonwealth v. Henderson, 497 Pa. 23, 30–31, 438 A.2d 951, 954 (1981).

Com. v. Noel, 629 Pa. 100, 121, 104 A.3d 1156, 1169 (2014).

---

examination of the prospective jurors, only "for cause challenges" may be made by either side. Com. v. Noel, 629 Pa. 100, 126, 104 A.3d 1156, 1172–73 (2014)

Further, the "list method" is not mandated by statewide civil procedural rule. Pa.R.C.P. 221 mandates that each party shall have four peremptory challenges to be exercised in turn starting with the Plaintiff. [24] In this instance, this trial court afforded the parties five peremptory challenges for the seating of the 12 primary jurors and two further peremptory challenges for the seating of four alternate jurors. No violation of the violation of the statewide rule occurred. Importantly, the Onyshko's did not exhaust all of their peremptory challenges. (T.T. 4/30/19 p. 309-310).

Finally, Wash. L-221 does not foreclose this trial court from utilizing a proper individual voir dire method. L-221 does not expressly state that only the "list method" may be sued. Instead, L-221 provides that:

> "After **examination of jurors** is completed, counsel...shall report to the Court those jurors whom they agree may be stricken for cause. If counsel are unable to agree that a juror be stricken for cause, the Court shall make the just cause determination and **may question the prospective juror** to resolve the challenge for cause. Thereafter, counsel...shall proceed to exercise their respective peremptory challenges..."

See Wash. L-221 (Emphasis Added) The language of L-221 contemplates an "examination" of all jurors and if deemed necessary further individual questioning

---

[24] "Each party shall be entitled to four peremptory challenges, which shall be exercised in turn beginning with the plaintiff and following in the order in which the party was named or became a party to the action." Pa.R.C.P. No. 221

to determine a challenge for cause. At that point, the parties are to proceed to utilize peremptory challenges. Critically, L-221 does not state that *after all examinations, including follow-up individual examinations, of all empaneled jurors is complete, only then shall peremptory challenges be utilized.* Wash. L-221 clearly contemplated the need for the court and the parties to conduct additional questioning of individual jurors after *an examination of all jurors.*

For the "examination" of jurors, the requirements are addressed in both Pa.R.C.P. 220.3 "Voir Dire" and L-220.3. Pa.R.C.P. 220.3 (c) provides:

> The court may provide for voir dire to include the use of a written questionnaire. However, the use of a written questionnaire without the opportunity for oral examination by the court or counsel is not a sufficient voir dire.

Pa.R.C.P. No. 220.3. Wash L-220.3 similarly provides:

> (2) Examination of potential **jurors** shall be conducted by the Court or its designee. The Court may permit counsel to supplement the Court's examination by such further inquiry as it deems appropriate.
> (3) The Court may direct, or permit, the use of a written questionnaire....

Id. These rules clearly require that either the trial court or counsel conduct an oral examination during voir dire that may be augmented by the use of a questionnaire.

In this case, before either party was put to the task of exercising a peremptory challenge, examination of the jury panel included three forms. First, all jurors completed two questionnaires, the statewide form that includes

information required by Pa.R.C.P. 220.3(b) and a separate questionnaire submitted by the parties, approved by this court and which consisted of 49 short answer questions. Second, this trial court conducted group voir dire, which included an examination of all jurors regarding all mandated components of Pa.R.C.P. 220.3 and additional matters requested by the parties. (T.T. 4/29/19 p. 29-68) Following these steps, the parties and this trial court then proceeded to individually examine each of the 66 jurors who indicated that serving in this case would cause a hardship. (T.T. 4/29/19, p. 67-234) During the course of individual "hardship" examinations, this trial court excused 44 jurors from service.

Third, this trial court and the parties then proceeded to a second day of voir dire, in which 27 jurors were individually interviewed by both court and the parties. This trial court questioned each of these 27 jurors regarding any affirmative responses each may have given in group voir dire. The parties were permitted a broad range of questioning that embraced topics beyond those asked in group voir dire or the questionnaires. This group of 27 was interviewed without either party being put to the task of first asserting a challenge for cause. After each individual interview, the parties were then asked to state any challenge for cause. In all, seven additional jurors were individually removed from the panel due to a sustained challenge for cause. If no challenge for cause were stated or sustained for an interviewed juror, the parties were then required to exercise a peremptory

challenge as to that juror. Each side was afforded time to "caucus" with their legal team which included individuals who only participated in jury selection. (T.T. 4/30/19)

After 12 jurors were seated, the selection of alternates then proceeded in a similar manner with each side receiving an additional two peremptory challenges. (T.T. 5/1/19, p. 2-68)

In summary, recognizing that "the impartiality and integrity of the jury" are critical, this trial court utilized the individual voir dire method for jury selection. Colosimo v. Pennsylvania Elec. Co., 513 Pa. 155, 518 A.2d 1206, 1209 (1986) and Bruckshaw v. Frankford Hosp. of City of Philadelphia, 619 Pa. 135, 148, 58 A.3d 102, 109 (2012). Such an effort was done to *efficiently and effectively* empanel fair and impartial jurors without either party being confronted with "a cracker jack box" seating of a juror who had not been subjected to an individual interview. Each juror seated in this case was examined multiple times. In this trial court's view, such a process does not offend Wash. L-221, which accommodates both the "individual" and "list" methods of jury selection. Such view matters because "the application, construction, and interpretation of a local rule of court are *matters* primarily to be determined by the court promulgating the local rule." Daddona v. Thind, 891 A.2d 786, 799–800 (Pa.Cmwlth. 2006). More importantly, such a process does not offend Pa.R.C.P. 220.3 and 221 and Federal and State

Constitutional requirements. Possessing broad discretion in determining the scope, manner and procedure of the voir dire examination, this trial court discerns no error, palpable or otherwise, in the utilization and execution of the individual voir dire method. Wytiaz v. Deitrick, 954 A.2d 643, 646 (Pa. Super. 2008). [25]

## ORDER

AND NOW, this 30th day of September, for the reasons set forth above the Plaintiffs' post-trial motions are DENIED.

BY THE COURT

MICHAEL J. LUCAS

Copies to: J. Luckasevic, Esq., M. Petrunya, Esq., G. Egdorf, Esq., J. Shrader, Esq., A. Hankin, Esq., L. Shtasel, Esq., L. Schlossberg, Esq., and R. Dapper, Esq.

---

[25] As to the Onyshkos' bare claim that this trial court "did not adequately take into account the hesitation, doubt and nervousness" of seated jurors and their ability to be fair, this trial court respectfully disagrees. Consistent with the requirements of Trigg v. Children's Hospital, 187 A.3d 1013, 1018 (Pa. Super. Ct. 2018), reargument denied (July 12, 2018), appeal granted, 201 A.3d 145 (Pa. 2019) this trial court contemporaneously observed all examined jurors' responses, prior to ruling on challenges for cause. Though this trial court's impressions from those observations may be very different from those advocated by counsel, Trigg does not require this trial court to surrender its honest assessment of an individual juror because counsel well states his position.